**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

Civil No. 6:16-cv-1302-Orl-37-TBS

Pirtek USA, LLC,

                  Plaintiff,

vs.

Michael J. Twillman, Dolores M. Twillman,
and Donald J. Twillman,

                  Defendants.

_____/

## PIRTEK USA'S MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff, Pirtek USA LLC ("Pirtek USA") moves for a preliminarily injunction against Defendants Michael Twillman, Dolores "Dee" Twillman and Donald Twillman (collectively, "Defendants" or the "Twillmans"). In support of this motion, Pirtek USA submits the following memorandum of law.

## INTRODUCTION

Pirtek USA is a franchisor of a business system that provides on-site hydraulic and industrial hose replacement products and services to customers in the manufacturing, oil, gas, construction, mining, earthmoving, and other industries that require on-site servicing to their heavy machinery and other equipment. The Twillmans ("Dolores," who goes by "Dee" is Michael's mother and Donald is Dee's husband and Michael's father), operate a crane company in Missouri and were familiar with Pirtek USA's services as a customer of a nearby Pirtek

franchise.  The Twillmans avidly pursued a Pirtek USA franchise and in fact signed a Franchise Agreement and Personal Guaranty on February 19, 2016.

The Franchise Agreement contains confidentiality and noncompetition clauses to prohibit franchisees from establishing or operating a competing business within approximately the same territory for two years after severing ties with Pirtek USA.  Nonetheless, after obtaining from Pirtek USA all of the confidential and proprietary financial, logistical, and other business information needed to start the franchise (or equivalent hydraulic hose business), the Twillmans announced they could "not proceed" with the Franchise Agreement, indicating that they would resume discussions with Pirtek in a few months about establishing a franchise.  Instead, however, the Twillmans almost immediately established a competing business called American Hydraulic Services, LLC, which operates in the same territory as, and performs the same services as, a Pirtek USA franchise.  The Twillmans also hired away trained technicians, and solicited customers from, another Missouri Pirtek USA franchise in violation of the Franchise Agreement.

Pirtek USA brings this motion to stop the irreparable harm being caused by the Twillmans' violation of the noncompetition and confidentiality clauses of the Franchise Agreement and to enjoin the Twillmans from continuing to unfairly use its proprietary and confidential information to compete with Pirtek USA and its other franchisees.

## FACTUAL BACKGROUND

### I.     Pirtek USA's Business

2

Pirtek USA is an international franchise organization founded in 1997 with a U.S. headquarters in Rockledge, Florida. (Declaration of Karin Ferretti ("Ferretti Decl."), at ¶ 1.) Pirtek has over 30 years of experience in the hydraulic and industrial hose replacement field, and provides hydraulic and industrial hose services to customers across the United States through its 58 franchises in 23 states. (*Id.*; *see also* Declaration of Glenn Duncan ("Duncan Decl."), at ¶ 1. ) Pirtek USA is the only franchisor of its kind currently operating in the U.S. (Duncan Decl., at ¶ 1.)

Pirtek USA has developed a business system for the sale, custom assembly, and installation of industrial and hydraulic hoses, fixed tube assemblies, fittings, and related components and services for customers operating businesses in a variety of industries, including manufacturing, oil and gas, mining, construction, earthmoving and agriculture. (Declaration of Steve Morris ("Morris Decl."), at ¶¶ 1-3.) Franchisees use the Pirtek USA business system to service and repair customer equipment at their customers' locations in the fastest possible time, minimizing downtime for the repair and service of such customers' equipment. (*Id.* at ¶ 2.)

Pirtek USA makes its distinctive services and products available to the public via authorized franchisees. (*Id.* at ¶ 4.) Pirtek USA franchisees typically operate their business from a hose service center and through mobile sales and service units by which a qualified technician, referred to as a Mobile Systems and Service Technician ("MSST"), can be on-site within one hour, 24 hours a day, 7 days a week, 365 days a year. (*Id.* at ¶ 5.)

## II.     The Twillmans Approach Pirtek USA and Avidly Pursue a Franchise

The Twillmans first contacted Pirtek USA on January 8, 2016, via an online inquiry through Pirtek USA's website. (Morris Decl., at ¶  8; Ferretti Decl., at ¶ 3.) Less than a week

3

later, Pirtek USA Franchise Director Steve Morris talked to Dee Twillman on the telephone about the possibility of opening a franchise. (Morris Decl., at ¶ 8.)   From the outset, the Twillmans seemed extremely eager to push things forward and learn the details of the Pirtek USA business model. (*Id.* at ¶ 10.)   On the call with Morris, Dee Twillman stated that the Twillmans were owners of a heavy equipment rental service, "Missouri Crane," and were customers of Pirtek USA's Overland Missouri franchise. (*Id.* at ¶ 9.) Dee further stated that she did not need to be "sold" on the Pirtek USA franchise because she already believed there was a need in the area of Missouri where the Twillmans did business. (*Id.*)

On the same call, Dee Twillman also informed Morris that Missouri Crane was staffed by employees who were union members. (*Id.* at ¶ 11.) Dee Twillman was adamant that her Pirtek USA franchise not use union employees and therefore wanted to set up their Pirtek USA franchise under Michael Twillman's name as an entirely separate company to avoid any requirement that they hire union employees and pay union wages. (*Id.*) Dee also later indicated that she and Donald would nonetheless be very involved in the franchise, including securing the financing needed to get the franchise up and running. (Duncan Decl., at ¶ 4.) She stated that she and Donald wanted to scale down and then eventually get out of the business. They thought that shifting over to a hydraulic hose company like a Pirtek franchise would be a better business opportunity for them in the long term. *Id.*

Over the next few weeks, Steve Morris had three additional conversations with the Twillmans, who continued to reiterate that they did not need to be sold on the franchise, but just wanted to move forward as quickly and economically as possible. (*Id.* at ¶ 13.) On January 29, 2016, Steve Morris exchanged emails with Michael Twillman about opening a retail site for the

4

franchise in Wentzville, Missouri. (*Id.*, at 15.) On February 2, 2016, Pirtek USA provided the Twillmans with its Franchise Disclosure Document ("FDD"), but required them to sign a confidentiality agreement not to use or disclose the information contained in the FDD except for purposes of pursuing a Pirtek USA franchise. (Ferretti Decl., at ¶¶ 4-5, Ex. A (FDD Confidentiality Agreement).)

During this time, the Twillmans informed Pirtek USA that they intended to start their franchise by hiring two MSSTs from the Overland, Missouri, Pirtek USA franchise—Daniel Wiele and James Pfaffenback—who had previously performed Pirtek USA-related work for Missouri Crane. (Morris Decl., at ¶ 12.) Pirtek USA advised the Twillmans that, if they did become a Pirtek franchise owner, the Pirtek USA would work with them and the Overland franchise to achieve a smooth transition so that the Twillman franchise might hire the two Overland employees, but that the Twillmans must afford the Overland franchise sufficient time to recruit and train replacements. (*Id.*; Duncan Decl., at ¶ 10.)

During all of these preliminary discussions with the Twillmans, Pirtek USA was careful not to share any proprietary and confidential business information with the Twillmans (with the exception of the FDD, for which Pirtek USA had required the Twillmans to sign a confidentiality agreement). (*Id.*, at ¶ 13.) It is Pirtek USA's practice not to disclose such information to prospective franchisees until they have signed the Franchise Agreement, which contains confidentiality and noncompetition clauses. (*See id.*)

## III.    The Twillmans Attend a Pirtek USA "Discovery Day" and Sign on the Spot

Like all prospective Pirtek USA franchisees, the Twillmans attended a Pirtek USA "Discovery Day" on February 19, 2016, at Pirtek USA's Florida headquarters. (Ferretti Decl. at

O KAD01 806839 v1

2616900-012353 07/20/2016

¶ 6.) Discovery Day is a one-day event organized by Pirtek USA for potential franchisees to meet the Pirtek USA executive team and learn about a range of topics essential to successfully operating a Pirtek USA center, including without limitation franchise training and support, supply chain management, Pirtek USA products and services, service delivery logistics and financial controls. (*Id.*) Prospective franchisees also typically tour the Franchise Support Center and Pirtek Distribution Center. (*Id.*)

The Twillmans were not typical prospective franchisees, however, and shortly after arriving on the morning of February 19, Dee Twillman told Pirtek USA Executive Director Glenn Duncan that she was ready to sign the Franchise Agreement immediately and did not want to spend her time going through each of the scheduled Discovery Day sessions. (Duncan Decl., at ¶ 3.) The Twillmans signed the Franchise Agreement and Personal Guaranty at lunch that day,[1] which is the first time in at least 14 years that anyone had signed a Pirtek USA Franchise Agreement on-the-spot at Discovery Day—let alone before the day was even done. (Ferretti Decl., at ¶ 8.) Dee Twillman also wrote a check on February 19 for the initial $25,000 franchise fee. (Morris Decl., at ¶ 17.) She asked three separate times that day if the check would be refundable. (*Id.*)

By signing the Franchise Agreement, Defendants were granted a license to operate a Pirtek USA franchised business using the Pirtek USA unique business system and trademarks in

---

[1] Dee Twillman again reiterated her concerns about the union, and was adamant that only Michael Sign the Franchise Agreement. Accordingly, Michael Twillman executed the Pirtek USA Franchise Agreement and Michael and Dee Twillman signed the Personal Guaranty on February 19, 2016. (Ferretti Decl., at ¶ 4) Donald Twillman later also signed the Personal Guaranty, subjecting him to the terms of the Franchise Agreement. (*Id.*)

O KAD01 806839 v1

2616900-012353 07/20/2016

a limited territory (the "Territory").  (*See, generally, id.*, ¶ 8, Ex. C.)  The Territory contemplated

by the parties generally comprised St. Charles County, Missouri.  (*Id.*, at ¶ 10.)

## IV.    The Franchise Agreement and Personal Guaranty

Because Pirtek USA provides new Pirtek franchisees with substantial proprietary and

confidential business and financial information to help establish their new franchises, the Pirtek

USA Franchise Agreement contains both a Confidentiality provision and a Noncompetition

provision, to prevent new franchisees from breaking with Pirtek USA to establish their own

business, while avoiding the responsibilities that accompany the franchise relationship.  (*See*

Ferretti Decl., at 8, Ex. C, §§ 6.E & 12.C.)  Section 6.E. of the Franchise Agreement prohibits the

Twillmans from disclosing or using Pirtek USA's proprietary or confidential business

information for any purpose except to operate a Pirtek USA Franchise:

> You may not, during the term of this Agreement or thereafter, communicate,
> divulge or use for the benefit of any other person or entity any Confidential
> Information, except to such employees as must have access to it in order to
> operate your Business. For purposes of this Agreement, "Confidential
> Information" means proprietary information contained in the Manual or
> otherwise communicated to you in writing, verbally, or through the internet or
> other online or computer communications, and any other knowledge or know-
> how concerning the methods of operation of our Business. Any and all
> Confidential Information, including, without limitation, processes, materials,
> methods, procedures, suggested pricing, specifications, techniques and other
> data, may not be used for any purpose other than conducting the Business in
> the Territory.

"Business" is a defined term under the Franchise Agreement, meaning: "your PIRTEK Business

developed and operated pursuant to this Agreement."  (*See id.*, § I.A.)

Pursuant to Section 12.C. of the Franchise Agreement, Defendants agreed to the

following non-compete:

You (including specifically Principal Owner and also any Personal Guarantors as described in Section 16.F) may not engage as an owner, partner, director, officer, franchisee, employee, consultant, agent or in any other capacity in any other business that sells products and services similar to the products and services sold by a PIRTEK business within the Territory or 15 miles of the territory or any Promotional Zone or the territory or promotion zone of any other PIRTEK center for a period of 2 years after expiration or termination of this Agreement. In addition, for the same 2-year period, you may not employ or seek to employ any person who is at that time employed by any other PIRTEK franchise or center or otherwise directly or indirectly induce such person to leave his or her employment. You expressly agree that the 2-year period and 15-mile radius are the reasonable and necessary time and distance needed to protect us if the Agreement expires or it terminated for any reason.

(*Id.*, § 12.C.)

Although Dee Twillman did not sign the Franchise Agreement, by signing the Personal Guaranty, she (and Michael's father, Donald Twillman, *see supra* at n. 1), "agree[d] to be personally bound by each and every condition and term contained in th[e] Franchise Agreement." (*Id.*, Personal Guaranty.)

## V. The Twillmans Continue To Give the Appearance of Interest in Establishing Their Franchise and Pirtek USA Provides Them Proprietary and Confidential Business and Financial Information Needed To Start Their Business

After Discovery Day, Pirtek USA began providing the Twillmans with a considerable amount of valuable confidential business information both verbally and in writing relating to being a Pirtek franchisee, including projections for gross receipts, gross profits, margins, labor charges and hourly wages and cashflows. (Duncan Decl., at ¶ 9; Morris Decl., at ¶ 18.)

While this information was being provided, the Twillmans continued to give the appearance of diligent franchisees, establishing their business. For example, on February 22 and 23, 2016, Michael Twillman verified that he had registered a web domain for the franchise and also corresponded with Karin Ferretti about possibly leasing space for their franchise in Wentzville, MO. (Ferretti Decl., ¶¶ 10-11.)

8

Yet the Twillmans also continued to exhibit other odd behavior.  For example, the Twillmans expressed no interest in attending the Pirtek Annual Conference for franchisees on March 11 & 12, and rebuffed Pirtek USA's efforts to get them to attend.[2]  (*Id.*, at 13.)  Likewise, the Twillmans did not want Pirtek to make announcements to other Pirtek franchises regarding the anticipated opening of the Twillmans' new Pirtek center in Wentzville, MO.

On March 2, 2016, Pirtek USA provided the Twillmans, in hard copy and electronic form, the Pirtek USA Start-Up Guide.  (Ferretti Decl., at ¶ 14.)  As its name implies, the Start-Up Guide materials are a detailed road map for new Pirtek USA franchisees, and tells them what they need to know to start a fluid transfer business and much more.  (*Id.*)  For example, the materials included an interactive electronic 2016 Pirtek USA pro forma, which reflects detailed cost estimates, budgets and calculated cash requirements applicable to the operation of a Pirtek USA franchise using a low-roof van option, which the Twillmans had indicated they intended to use.  (*Id.*)  These materials provided the Twillmans with detailed Pirtek USA center inventories and related costs, three years of profit and loss projections, a projected year-end balance sheet and cash flow analysis, payroll projections, and a detailed start-up guide addressing the number of vans needed, lease-related budgets, licensing and permitting fees, technician wages, and costs associated with various forms of insurance.  (*Id.*)

Pirtek would not have disclosed such detailed confidential business information to the Twillmans had they not been bound by the confidentiality and noncompetition provisions of the Franchise Agreement.  (*Id.*)  Pirtek would not have disclosed such information if it knew the

---

[2] The Annual Conference provides an opportunity for franchisees to network with one another, learn more about the Pirtek franchise system, and meet Pirtek vendors.  Approximately 98% of Pirtek franchisees typically attend the Annual Conference (Ferretti Decl., at ¶ 13.)

O KAD01 806839 v1

2616900-012353 07/20/2016

Twillmans would use it to open their own competing business in the same territory.  (Duncan Decl., ¶ 11.)

## VI.    The Twillmans Abruptly "Cancel" Their Pirtek USA Franchise Agreement

After the Twillmans had access to valuable confidential business information of Pirtek USA—in fact the day after being sent the Start-Up Guide—Dee sent Karin Ferretti a letter signed by Michael, Dee and Donald informing Pirtek USA that the Twillmans could "not proceed" with the Franchise Agreement.  (Morris Decl., at ¶ 19; Ferretti Decl.; at ¶16, Ex. E.) The Twillmans' stated reason for not proceeding with the franchise was their concern with union issues.  (Morris Decl., at ¶ 19.)  The Twillmans indicated that they wanted to wait a few months and then proceed again.  (*Id.*)  They requested the return of their initial $25,000 franchise fee. (*Id.*; Ferretti Decl., Ex. E.)  Michael Twillman asked to be kept in the Pirtek USA database to receive company announcements.  (Ferretti Decl., at ¶ 18.)  On March 14, 2016   Michael Twillman sent Karin Ferretti a document indicating that the Twillmans had terminated limited liability company under which they were going to operate their Pirtek franchise.  (*Id.*, at ¶ 19.)

Pirtek USA requested the original Franchise Agreement from the Twillmans, but the Twillmans only ever sent back a copy, which they had stamped "Withdrawn/Cancelled (03-03-2016)" (Morris Decl., at ¶ 20.)  The Twillmans also have not confirmed that they have returned all electronic copies of the Start-Up Guide, including the highly confidential and valuable interactive pro forma.  (Ferretti Decl., at ¶ 17.)

Although the Twillmans attempted to "cancel" the contract, the confidentiality and non-compete clauses are enforceable, by their very terms, regardless of how the parties to the contract part ways.   Also, Pirtek cannot be held to have waived its rights under these provisions,

10

especially given that the Twillmans' "cancellation" and request for return of the franchise fee were based on the fraudulent pretense that the Twillmans merely wanted to wait a few months until union concerns blew over and then proceed again with the franchise.  Pirtek USA would never have given the Twillmans this information if it knew that the Twillmans would later use it to establish a competing business in the same territory as the Pirtek franchise they had contracted for.  (Duncan Decl. at ¶ 11.)

## VII.   The Twillmans Begin Their Own Fluid Transfer Business, Identical to a Pirtek Franchise, and Otherwise Violate the Confidentiality and Noncompetition Provisions of the Franchise Agreement

The same day that the Twillmans cancelled their franchise LLC, Michael Twillman filed Articles of Organization with the State of Missouri, forming American Hydraulic Services, LLC. (Ferretti Decl., at ¶ 20, Ex. F, Certificate of Organization and Articles of Organization.)  Under this new business, the Twillmans are performing the same services as those performed by Pirtek USA franchisees.  (Ferretti Decl., at ¶ 21.)

In addition, the Twillmans, through American Hydraulic Services, now employ two former mobile technicians of the Overland Pirtek, Mr. Wiele and Mr. Pfaffenback, as Dee Twillman had identified earlier.  (Ferretti Decl., at ¶ 21; Declaration of Tim Hastings ("Hastings Decl."), at ¶ 3.)  These mobile technicians are highly trained and critical to the success of such a business.  (Declaration of David Penning ("Penning Decl."), at ¶ 4.)  Due to this, Wiele and Pfaffenback had signed their own noncompetition clauses with the Overland Pirtek franchisee, which they are now violating.  (*Id.* at 5, Ex. A.)

Upon learning of their change in employment, Pirtek USA Regional Sales Representative Tim Hastings (who knew them both from training them when they began at the

11

Overland Pirtek franchise) went to go visit Wiele and Pfaffenback at American Hydraulics Wentzville location.   (Hastings Decl., at ¶ 3.) They confirmed that they were both now working as mobile technicians for American Hydraulics, with Mr. Pfaffenback as the lead technician. (*Id.*)   Mr. Hasting observed that American Hydraulics had vans identical (aside from the branding and trademarks) to Pirtek vans and that Wiele and Pfaffenback had set up the American Hydraulic Services van with hose and fitting equipment identical to Pirtek vans, with all of the same customizations. (*Id.*)   Mr. Hastings also learned that Dee Twillman was involved in the new company, including in any hiring decisions.   (*Id.* at ¶ 4.)   He also spoke to Donald Twillman, who talked about American Hydraulic Services as if it were his company and who was obviously involved in the decision-making of the company. *Id.*

After moving over to the Twillmans' company, Mr. Wiele and Mr. Pfaffenback have solicited the business of numerous customers of the Overland Pirtek franchise on behalf of American Hydraulic Services.   (*Id.*, at ¶ 4; Penning Decl., at ¶ 8; *see also* Declaration of Randy McElroy ("McElroy Decl."), at ¶ 4-6.)

Pirtek USA has no means of enforcing its contract rights other than to seek an injunction from the Court to prevent the Twillmans from violating the confidentiality and noncompetition provisions of the Franchise Agreement.

## ARGUMENT

"A preliminary injunction may be issued when necessary to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision." *Wine Not, Int'l Inc. v. 2atec, LLC*, No. 8:06-CV-117-T-23TGW, 2006 U.S. Dist. LEXIS 46218, at *10-11 (M.D. Fla. May 18, 2006).  In the Eleventh Circuit, in order to obtain a preliminary

12

injunction, a party must establish that: (1) there is a substantial likelihood plaintiff will prevail on the merits; (2) there is a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the defendant; and (4) granting the preliminary injunction will not disserve the public interest. Fed. R. Civ. P. 65(b). *See also Forsyth Cnty. v. U.S. Army Corps of Eng'rs,* 633 F.3d 1032, 1039 (11th Cir. 2011). Under these factors, Pirtek USA is entitled to preliminary injunctive relief here.

## 1.    The Likelihood of Success Favors Pirtek USA

Pirtek USA has shown a substantial likelihood of success that it will prevail on the merits of its claims against Defendants for breach of the noncompetition and confidentiality restrictions in the Franchise Agreement.

### a.    Pirtek USA's Post-Termination Restrictive Covenants Are Reasonable, Enforceable, and Seek to Protect Pirtek USA's Legitimate Business Interests

Florida law is clear:  an agreement, like the Franchise Agreement here, restricting or prohibiting competition is valid to the extent reasonably necessary to protect a "legitimate business interest." Fla. Stat. § 542.335.  Indeed, section 542.335(1)(b) expressly contemplates that legitimate business interests warranting protection include, but are not limited to, "[v]aluable confidential business or professional information," "[s]ubstantial relationships with specific prospective or existing customers," and "specialized training." Fla. Stat. § 542.335(1)(b)(1)-(5).

Florida law governs Pirtek USA's breach of contract claim, as each of the governing agreements contains a Florida choice-of-law provision. (Ferretti Decl., at ¶ 8, Ex. C (Franchise Agreement)); *see also Godwin Pumps of Am., Inc. v. Ramer*, No. 8:11-cv-580-T-24 AEP, 2011

13

U.S. Dist. LEXIS 73754, at *9 (M.D. Fla. July 8, 2011) (recognizing that, in Florida, courts will generally enforce a choice-of law clause unless the law of the chosen forum contravenes strong public policy).   Florida law in particular recognizes covenants not to compete arising from franchise or license agreements insofar as they are reasonably limited as to time and area, and further a legitimate business interest.  Fla. Stat.§ 542.33(1)(b).  Florida law also provides that the breach of an enforceable restrictive covenant creates a presumption of irreparable injury, and that injunctive relief is an appropriate remedy for such a breach. Fla. Stat. § 542.335(1)(j). *See also R.J. Gators Franchise Sys., Inc. v. MBC Rests., Inc.,* No. 2:05-cv-00494-VMC-DNF, 2005 WL 4655379, at *4 (M.D. Fla. Nov. 6, 2005) (enforcing covenant not to compete restricting defendant former franchisee from operating a competing business within 10 miles of the former franchise for a period of 24 months).

Pirtek USA has several legitimate business interests in preventing competition by Defendants.   First, Pirtek USA possesses a legitimate business interest in preventing the Defendants' unauthorized use of valuable and confidential Pirtek USA business information obtained through the Defendants' sham pursuit of a Pirtek USA franchise.  The Pirtek Start-Up Guide and 2016 Pirtek pro forma provided to the Twillmans include a detailed listing of the Pirtek USA mobile service equipment and van tool inventory, as well as detailed cost estimates, budgets and calculated cash requirements, applicable to the operation of a Pirtek franchise using a low-roof van option, which the Twillmans had indicated they intended to use.  (Ferretti Decl., at ¶ 14.)   Moreover, in the period between their execution of the Franchise Agreement on February 19, 2016 and March 3, 2016, when they requested cancellation, Pirtek USA personnel disclosed to Defendants detailed confidential business information, including franchisee margins,

14

revenues, cashflows, labor costs, employee bonus structures and customer and market targeting and sales strategies. (Morris Decl., at ¶ 18; Duncan Decl., at ¶ 9.)

Defendants' detailed knowledge and use of Pirtek's confidential business information in operating American Hydraulics has provided the Defendants an unfair competitive advantage. *See* Fla. Stat. § 542.335(1)(b) (recognizing "legitimate business interest" in preventing the unauthorized use of "valuable confidential business or professional information".)

The post-termination noncompete also protects Pirtek USA's interest in refranchising in the St. Charles, Missouri area. A franchisor "has an interest in being able to place a new franchisee at or near the same location where" customer goodwill has been created. *Jiffy Lube Int'l v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993). Where a prospective franchisee uses confidential business information and trained former employees to open a competing operation with the immediate capacity to funnel former customers away from the franchise, it becomes exceedingly difficult for a franchisor to franchise an area. After forming American Hydraulics, the Twillmans hired away Overland Pirtek employees and used those employees to solicit numerous current Pirtek USA customers in the St. Charles County and Overland territories. (Ferretti Decl., at ¶ 21; Hastings Decl., at ¶ 3.) Pirtek USA's ability to franchise St. Charles County has been irreparably damaged by Defendants breach of their post-term noncompete.

Further, if a prospective franchisee is allowed to escape its promise not to compete, the obvious question by other prospective and current franchisees is, "Why can't I?" Courts have, time-and-time-again, recognized that absent enforcement of the noncompete a franchisor's "current franchisees may think that they can violate their franchise agreements with impunity

15

after having taken advantage of [the franchisor's] good will to build their business, potentially causing [the franchisor's] entire franchise system [to] unravel." *See Anytime Fitness, Inc. v. Reserve Holdings, LLC,* Case No. 08-cv-4905, 2008 WL 5191853, at *6 (D. Minn. Oct. 8, 2008); *see also Medi-Weightloss*, 2010 U.S. Dist. LEXIS 42264, at *13 (recognizes the franchisor had a legitimate interest in its "right to ensure continued compliance with its agreements by other franchisees"). This concern is particularly acute where the prospective franchisee never opens the franchise and chooses to open a competing business instead. Allowing the Twillmans to avoid their obligation not to compete would send the message prospective Pirtek USA franchisees that they are free to string along Pirtek USA corporate headquarters – obtaining valuable confidential business information in the meantime – so long as they back out before opening their franchise.

Pirtek USA also has a legitimate business interest in the substantial relationships with specific existing customers with whom Defendants have interfered. Consider, for example, Overland Pirtek customer Randy McElroy of Missouri Smelting Technology. After opening American Hydraulic Services using two Overland Pirtek MSSTs, the Twillmans had those same MSSTs solicit Missouri Smelting Technology, who had consistently used Overland Pirtek to provide hydraulic equipment and hydraulic hoses for over five years. (McElroy Decl., at ¶¶ 3-6.) Although McElroy refused American Hydraulics' solicitations, American Hydraulics has since succeeded in poaching hydraulic hose manufacturing business from other departments at Missouri Smelting. (*Id.* at ¶ 6.) Defendants' interference with Pirtek USA's substantial existing customer relationships is yet another legitimate business interest protected by Pirtek USA's noncompete.

16

Finally, enforcing Pirtek's noncompete against Defendants will protect Pirtek USA's legitimate business interest in the specialized technical training provided to Pirtek MSSTs. MSSTs undergo comprehensive training courses at Pirtek USA, LLC's headquarters in Rockledge, Florida, and acquire deep experience and knowledge about Pirtek USA's products and services, pricing, promotions, equipment and methods. (Penning Decl. ¶ 4.) The Overland Pirtek MSSTs Mr. Wiele and Mr. Pfaffenback additionally received franchise-specific training directly from Overland Pirtek owner Dave Penning and Pirtek Regional Sales Representative Tim Hastings. (*Id.*; Hastings Decl., at ¶ 2.) Should the Court decide against enforcing Pirtek USA's noncompete, American Hydraulics would be free to capitalize on the specialized training Pirtek USA provided to Mr. Wiele and Mr. Pfaffenback to Pirtek USA's detriment.

Because Pirtek USA has established numerous legitimate business interests warranting protection through its restrictive covenants, the burden now shifts to the Defendants to show that the competitive restrictions are "overbroad, overlong or otherwise not reasonably necessary to protect the established legitimate business interests." Fla. Stat. § 542.335(1)(c) (2011). Defendants will be unable to rebut that statutory presumption.

Not only has Pirtek USA established that its noncompete and confidentiality clauses are enforceable and necessary to protect its legitimate business interests, but it can also establish a likelihood that it will ultimately prevail on its claims.

> **b. Defendants Have Breached Pirtek USA's Post-Term Noncompete and Confidentiality Agreement**

For a breach of contract claim, Florida law requires a plaintiff to plead and prove: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). Pirtek USA has

17

presented evidence demonstrating a likelihood of success on each of these elements for both the confidentiality and noncompetition clauses.

The Twillmans voluntarily entered into and signed either the Franchise Agreement or Personal Guaranty, binding them to the noncompetition and confidentiality clauses. (Ferretti Decl., at ¶ 8, Ex. C.) As detailed above, the Twillmans breached the noncompetition clause by establishing a competing business, identical to a Pirtek USA franchise, in the same location (Wentzville, Missouri) immediately after "cancelling" its contract with Pirtek USA. The Twillmans also breached the noncompetition clause by hiring Mr. Wiele and Mr. Pfaffenback away from the Overland, MO Pirtek franchise, which is explicitly prohibited by the noncompetition clause of the Franchise Agreement. Pirtek USA has been harmed by such competition, as the Twillmans new company has solicited and taken customers from other Pirtek USA franchisees. Pirtek USA was also harmed by the Twillmans hiring away mobile technicians from the Overland, Missouri franchise, in whom Pirtek USA and the Overland franchise had invested substantially in training.

Pirtek USA has also shown a substantial likelihood of success on its claims relating to breach of confidential information restrictions. Both the confidentiality agreement signed when the Twillmans received the FDD (*see* Ferretti Decl., ¶ 4, Ex. A) and the confidentiality clause in the Franchise Agreement similarly prohibits confidential information from being used for any reason other than operating a Pirtek franchise. (*Id.* at ¶ 8, Ex. C.) As outlined above, Pirtek USA provided to the Twillmans valuable proprietary information warranting protection, including but not limited to its Start-Up Guide and 2016 Pirtek pro forma, which the Twillmans did not return to Pirtek USA and have used to establish its new business. Pirtek USA and its franchisees have

O KAD01 806839 v1

2616900-012353 07/20/2016

been harmed by this breach, as the Twillmans' new company is soliciting Pirtek customers and competing with Pirtek USA and its franchisees using Pirtek's own proprietary and confidential information about the Pirtek USA business system. Pirtek USA is also harmed by not having control over its confidential and proprietary business information, which may be further shared and exploited.

**2.     Pirtek USA Will Suffer Irreparable Harm Without an Injunction**

Violation of an enforceable restrictive covenant creates a presumption of irreparable harm, Fla. Stat. § 542.335(1)(j), and an injunction is the common and preferred remedy. *See N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1230 (M.D. Fla. 2002) (recognizing that, once the party seeking to enforce the restrictive covenant establishes one or more "legitimate business interests" justifying protection, irreparable injury must be presumed and the burden shifts to the defendant to establish the absence of such injury). Moreover, a court "[s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(g)(1).

Notwithstanding the statutory presumption, however, Pirtek USA can demonstrate that it has suffered and will continue to suffer actual and imminent injury if an injunction does not issue. Specifically, in the absence of injunctive relief, Pirtek USA will have to compete with former prospective franchisees who agreed not to engage in such competition, and will lose the confidentiality of its proprietary and confidential information. In the Eleventh Circuit, this is enough to meet Pirtek's burden as to the irreparable harm prerequisite. *Medi-Weightloss*, 2010 U.S. Dist. LEXIS 42264 at *19; *see also The Continental Group, Inc. v. KW Prop. Mgmt, LLC*, 622 F. Supp. 2d 1357, 1377-78 (S.D. Fla. 2009) (finding irreparable harm when an employee

19

wrongfully retained confidential information even where the new employer agreed to not use any of the wrongfully retained information); *Johnson Controls Inc.*, 2008 U.S. Dist. LEXIS 4310, at *43 (finding irreparable injury where an employee with exposure to the plaintiff's confidential information began working with plaintiff's competitor).

### 3.   The Balance of Harms Analysis Weighs In Favor of Pirtek USA

The balance of harms analysis weighs in Pirtek USA's favor in the enforcement of the restrictive covenant that Defendants accepted. "Courts are generally unsympathetic to franchisees who blatantly disregard covenants not to compete." *I Can't Believe It's Yogurt v. Gunn*, No. Civ.A. 94-OK-2109-TL, 1997 WL 599391, at *20 (D. Colo. Apr. 15, 1997). Defendants were cognizant of the restrictive covenants at the time they signed the Franchise Agreement and related personal Guaranty.   In contrast to the irreparable harm to Pirtek USA's franchise system, Defendants will suffer only self-inflicted harm.

### 4.   A Preliminary Injunction Advances the Public Interest

A preliminary injunction enforcing the restrictive covenants will serve the public interest, because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations.  *See Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004) (enforcement of non-compete furthers public interest by assisting plaintiff in "protecting its investment in confidential and proprietary business information that it uses to become a more profitable and efficient business enterprise").   Indeed, Fla. Stat. § 542.335(i) provides:

> No court may refuse enforcement of an otherwise enforceable restrictive covenant on the ground that the contract violates public policy unless such public policy is articulated specifically by the court and the court finds that the specified public policy requirements substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint.

20

Moreover, there is no negative impact on the public interest from enforcing reasonable and legitimate contract terms, such as the restrictive covenants at issue here. Indeed, "the failure to enforce the restrictive covenants in any manner in the face of clear violations disserves the interest of the public in promoting contracts and fair competition." *Johnson Controls*, 2008 U.S. Dist. LEXIS 4310 at *46. In light of the reasonable and limited scope of the injunction sought here, the public will not be harmed.

5. **The Court Should Exercise Its Discretion to Grant Injunctive Relief Without Requiring Security**

The Court has the discretion to set the amount of security or waive the security requirement of Rule 65(c). *BellSouth v. MCI Metro Access,* 425 F.3d 964, 971 (11th Cir. 2005). The amount of the bond ordinarily depends on the gravity of the potential harm to the enjoined party. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 at n.3 (4th Cir. 1999).

Here, the Court should conclude that Pirtek USA is not required to post security because there is no proof of likelihood of harm to Defendants other than the ceasing operation of the competing business and there is no material risk that Pirtek USA would be unable to satisfy any damages that might ultimately be found due as a result of injunctive relief. To the extent the Court believes a bond is required, Pirtek suggests a nominal bond sufficient to secure the injunctive relief sought.

## CONCLUSION

For the foregoing reasons, this Court should grant Pirtek USA's request for preliminary injunction, requiring the Twillmans to return or destroy all of Pirtek USA's confidential

O KAD01 806839 v1

2616900-012353 07/20/2016

information and requiring the Twillmans to cease the business activities of American Hydraulic

Systems, LLC and to otherwise abide by the terms of the noncompetition clause they signed.

Date: July 20, 2016

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
SunTrust Center
200 South Orange Ave., Ste. 2900
P.O. Box 1549 (32802)
Orlando, FL 32801
Tel:  (407) 422-6600
Fax:  (407) 841-0325
Counsel for Plaintiff

By:   _____
      JAMES M. TALLEY
      Florida Bar No.: 331961
      jtalley@bakerdonelson.com
      fedcts@bakerdonelson.com
      KYLE A. DIAMANTAS
      Florida Bar No.: 106916
      kdiamantas@bakerdonelson.com


Of Counsel (*Pro hac vice* applications to be submitted)
FAEGRE BAKER DANIELS
William L. Killion, MN # 55700
Nathan A. Brennaman, MN # 0331776
2200 Wells Fargo Center,
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

O KAD01 806839 v1

2616900-012353 07/20/2016