**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

PIRTEK USA, LLC,                    )
                                   )
            Plaintiff,             )
                                   )      Case No. 6:16-cv-01302-RBD-TBS
v.                                 )
                                   )
MICHAEL J. TWILLMAN, DOLORES       )
M. TWILLMAN, and DONALD J.         )
TWILLMAN,                          )
                                   )
                                   )
            Defendants.            )

<u>**DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO PIRTEK USA'S MOTION**</u>
<u>**FOR PRELIMINARY INJUNCTION**</u>

Defendants Michael J. Twillman, Dolores M. Twillman, and Donald J. Twillman ("Defendants" or "the Twillmans") oppose Plaintiff Pirtek USA, LLC's ("Pirtek") Motion for Preliminary Injunction.

**I.      <u>INTRODUCTION</u>**

The Twillmans had every intent to open a Pirtek franchise when they first contacted Pirtek in early 2016. They flew to Florida (at their expense) to meet with Pirtek officials and began the process of looking for a space that would house their franchise. Michael Twillman ("Michael")[1] signed a Franchise Agreement on February 19, 2016. The Twillmans' interest in Pirtek was genuine. But as the franchise process started to get underway, Dolores ("Dee") Twillman became aware of an increasingly tense situation between Local 513 and other Pirtek franchises.

Before expressing an interest in Pirtek, the Twillmans were busy running their family businesses, including Missouri Crane, Inc. ("Missouri Crane"). Missouri Crane is a union shop,

---

[1] The Defendants are referred to by their first names because they all share the same last name.

and the Twillmans hoped to establish the Pirtek franchise as a non-union shop for financial reasons. It soon became apparent that establishing a non-union shop would be impossible and that doing so would also jeopardize the Twillmans' Missouri Crane business and their livelihood.

On March 9, 2016, the President of Local 513 noted that negotiations with Pirtek had reached a standstill, and that a strike might be coming.  Based on her past experiences with the unions, Dee feared that the situation between the union and Pirtek would escalate and that Missouri Crane could lose its client base if the Twillmans were known to be operating a non-union shop (through the proposed Pirtek franchise).  The Twillmans then decided to cancel the Franchise Agreement according to the terms of the Franchise Disclosure Document.  Pirtek accepted the Twillmans' right or ability to cancel the contract, and promptly refunded the Twillmans' their $25,000 deposit.  Ultimately, Dee's concerns about the union situation were realized; in May 2016, Local 513 sent letters to hundreds of area contractors, urging them not to do business with Pirtek because Pirtek did not have a contract with the union.

Even though the Pirtek franchise opportunity had not worked out, the Twillmans were still interested in expanding their existing hose business into a new business.  To that end, they registered American Hydraulic Services, LLC ("American Hydraulic") and began operating an independent business which had a contract with Local 513.  The Twillmans are relying on their industry contacts and past experience in the hose business to run American Hydraulic; they are not relying on any confidential information from Pirtek.

Fundamentally, this case is about competition.  But it is about Pirtek's efforts to stifle and evade fair competition from American Hydraulic and not about the Twillmans' alleged use of Pirtek's "confidential information."  The Twillmans made every effort to establish a viable Pirtek franchise.  But when Pirtek's interactions with Local 513 scuttled these plans, the Twillmans used

2

their existing contacts and experience in the hose and construction business to establish their own hose business.  Upset with entry of a new competitor in the St. Louis hose marketplace, and perhaps reeling from the effects of its dispute with Local 513, Pirtek filed this lawsuit, seeking to enjoin the Twillmans from operating American Hydraulic.  However, because Pirtek cannot establish a substantial likelihood of success on the merits, or any of the other preliminary injunction factors, Pirtek's Motion for Preliminary Injunction should be denied in its entirety.

## II.    **FACTUAL BACKGROUND**[2]

Pirtek is an international franchise organization founded in 1997, with its United States headquarters in Rockledge, Florida.  Complaint at ¶9.  The company provides hydraulic and industrial hose services to customers in the United States through its 58 franchises in 23 states.  *Id*. Pirtek franchisees typically operate their business from a hose service center and through mobile sales and service units.  *Id.* at ¶10.

Dee, along with her husband Donald Twillman ("Donald"), and son Michael, run their small family businesses, which include MCI Construction Company and Missouri Crane. Affidavit of Dolores M. Twillman in Support of Defendants' Motion to Transfer and in Support of Defendant's Opposition to Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law ("Dee Affidavit") at ¶4.  These companies operate within a small number of counties in Missouri and Illinois.  *Id.* at ¶5.

**The Twillmans Decide to Enter the Hose Business**

Dee Twillman has been in the construction business for more than forty years, and in that time, has come to know and work for, or work with, many of the contractors in town.  *Id.* at ¶6.

---

[2] The factual background is largely taken from the Defendants' supporting affidavits.  Some facts are taken from the Complaint for background purposes, but Defendants do not accept the allegations of the Complaint as true.

As early as October 1996, the Twillmans became involved in the hose business, when they bought a hose machine for Missouri Crane.  This was long before Pirtek had entered Missouri.  *Id.* at ¶8.

The Twillmans wanted to shift to a Pirtek franchise to take advantage of disparities in local labor costs and conditions.  *Id.* at ¶10.  The crane business also has high liability and the Twillmans were hoping to enter a lower-liability business and one where they had an existing knowledge of how the business operated.  *Id.* at ¶12.  However, absent some ability to operate as a non-union business, the Pirtek opportunity would provide no benefit to the Twillmans.  *Id.* at ¶¶10, 13.

Dee was familiar with Pirtek and their business because Missouri Crane had used Pirtek a number of times over a few short years.  Pirtek and Missouri Crane also shared a lot of the same customers.  *Id.* at ¶11.  In January 2016, Dee spoke with Steve Morris, Pirtek's Franchise Director, about the possibility of owning a Pirtek franchise.  Complaint at ¶13.  On February 2, 2016, Pirtek provided the Twillmans with the company's Franchise Disclosure Document ("FDD").  The FDD included a Confidentiality Agreement, which Michael and Dee signed.  Complaint at ¶14.

The Twillmans believed the Pirtek franchise would be a good fit for them and made every effort to make a Pirtek franchise viable.  Dee Affidavit at ¶13.  Their interest was genuine.  *Id.* at ¶14.  On February 19, 2016, Michael and Dee attended Pirtek's one-day sales event.  Dee Affidavit at ¶15; Complaint at ¶20.  That same day, Michael signed the Franchise Agreement.  Affidavit of Michael J. Twillman in Support of Defendants' Motion to Transfer and in Support of Defendant's Opposition to Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law ("Michael Affidavit") at ¶5.

The Twillmans did not learn any trade secrets during this meeting.  Dee Affidavit at ¶15.  The Twillmans then formed Missouri Hydraulics & Services, LLC to operate the Pirtek franchise

and began looking for a storefront. *Id.* at ¶17. Unfortunately, issues with Local 513 necessitated that the Twillmans end their relationship with Pirtek. *Id.* at ¶19.

**Local 513 and Its Dispute with Pirtek Necessitates Cancelling the Franchise Agreement**

The Twillmans' principal business, Missouri Crane, has a contract with Local 513 Hoisting and Portable of the International Union of Operating Engineers ("Local 513"). *Id.* at ¶20. Just three days after signing the Personal Guaranty of the Franchise Agreement, Dee became aware of an increasingly tense situation between Local 513 and Pirtek's Franchise in Overland, Missouri ("the Overland Franchise"). After negotiating for nearly a year, the Overland Franchise still did not have a contract in place with Local 513, and the union was threatening to strike. *Id.* at ¶21. Before signing the Personal Guaranty, Dee had believed that the Overland Franchise would sign with the union. *Id.*

Based on her past experiences with the unions, Dee feared that Local 513's ongoing dispute with the Overland Franchise would soon cast all Pirtek franchises in a negative light with the union and union contractors and companies, which, in turn, would have significant consequences for the Twillmans' Missouri Crane business (since Missouri Crane had a contract with Local 513). *Id.* at ¶22. Missouri Crane is the Twillmans' livelihood and Dee could not afford to risk that livelihood by getting into the middle of a fight between Local 513 and Pirtek. *Id.* at ¶23. Setting up a non-union company (the Pirtek franchise) would have created significant problems for the Twillmans, since Missouri Crane is a union company. Dee feared that continuing with the Pirtek franchise had the potential to destroy both the Pirtek franchise and Missouri Crane by cutting off access to a necessary customer base. *Id.* By early March 2016, it was clear that the Pirtek name had become damaged throughout Missouri and Illinois because of its fight with the union. *Id.* at ¶24. The Twillmans then decided they had to cancel the Franchise Agreement. *Id.* at ¶25.

Dee's concerns were soon realized. On March 9, 2016, Local 513 wrote a letter to Missouri Crane, noting that its contract negotiations with Pirtek were proving unsuccessful, and that the union would "take all legal means to obtain a fair and equitable contract for its members with Pirtek," including by way of a strike. *Id.* at ¶26. Pirtek was copied on this letter. *Id.* On May 16, 2016, Local 513 sent letters to hundreds of contractors around Missouri, Illinois, and beyond, urging them not to do business with Pirtek as a non-signatory contractor. *Id.* at ¶27. Around this same time period, Dee learned that Local 513 was also urging "all members and contractors to refrain from doing business with the Pirtek-Fenton store." *Id.* at ¶29.

**The Twillmans are Forced to Cancel the Franchise Agreement**

On March 3, 2016, Dee emailed Steve Morris to tell him that they would be cancelling the startup process for the franchise. *Id.* at ¶32. In a letter to Pirtek, Michael, Donald, and Dee thanked Pirtek for working with them, but added that they could not proceed with the franchise. *Id.* The Twillmans noted that they were returning copies of Pirtek's materials and added that they understood the "franchise agreement gives us the ability to discontinue this project at this time and receive back our $25,000.00 dollar down payment." *Id.* The Twillmans' cancellation procedure followed the exact cancellation procedure outlined by the FDD. *Id.* at ¶34.

On March 11, 2016, Michael emailed Steve Morris at Pirtek, to let him know that the Twillmans had cancelled their contract with Pirtek. Michael Affidavit at ¶8. Michael attached a copy of the cancelled Franchise Agreement and Personal Guaranty to this email, with each page clearly stamped "WITHDRAWN / CANCELLED (03-03-2016)", per Pirtek's instruction. *Id.*; Dee Affidavit at ¶37. That same day, Michael mailed, by Certified Mail, the original signed Franchise Agreement and supporting documents to Pirtek's office. Michael Affidavit at ¶9.

On March 14, 2016, Karin Ferretti, Pirtek's Franchise Development Administrator, acknowledged receiving a copy of the cancelled executed franchise agreement and stated that a refund check had been issued and would be mailed out. *Id.* at ¶10. Pirtek did not dispute the cancellation and Pirtek employees told Michael over the phone that they had received the package of materials and that they would be refunding the check. Pirtek never requested that the Twillmans return any additional items. *Id.* at ¶¶11-12. On March 17, 2016, Dee received and deposited a refund check from Pirtek for $25,000. Dee Affidavit at ¶39.

**The Twillmans Create American Hydraulic Services Because of the Union Issues and Without Relying on Any Confidential Pirtek Information in Running that Business**

On March 14, 2016, the Twillmans formed American Hydraulic Services, LLC ("American Hydraulic"). Dee Affidavit at ¶40. American Hydraulic is not relying on, or in possession of, any confidential Pirtek information or Pirtek trade secrets. *Id.* at ¶41. Likewise, the Twillmans have not accessed and have not used any protectable Pirtek confidential information in running American Hydraulic. *Id.* at ¶43. American Hydraulic is not using any Pirtek hoses, fittings, or other Pirtek-branded items. *Id.* at ¶45. Instead, the Twillmans are using their decades of experience in the construction industry and their past experience in the hose business to run American Hydraulic. *Id.* at ¶47.

Daniel Wiele and James Pfaffenback are Mobile Sales and Service Technicians ("MSSTs") and current employees of American Hydraulic. Mr. Wiele and Mr. Pfaffenback are both members of Local 513 and they are the only MSSTs at American Hydraulic. *Id.* at ¶48. Mr. Wiele and Mr. Pfaffenback left Pirtek Overland because they were unhappy there and being treated unjustly. They were not solicited by the Twillmans. *Id.*

Believing that the Twillmans are using Pirtek's confidential information to run American Hydraulic, are soliciting Pirtek customers, and unlawfully hired Mr. Wiele and Mr. Pfaffenback,

7

Pirtek initiated this lawsuit.  Pirtek now seeks injunctive relief to halt the operation of American

Hydraulic and to force the Twillmans to return or destroy the company's confidential information.

## III.   INJUNCTIVE RELIEF IS AN EXTRAORDINARY REMEDY AND SHOULD BE GRANTED ONLY SPARINGLY

A preliminary injunction is an "extraordinary and drastic remedy" and should be granted

only after the moving party proves: (1) there is a substantial likelihood the party will succeed on

the merits; (2) a substantial threat of irreparable harm; (3) the threatened harm to the plaintiff

outweighs the potential harm to the defendant; and (4) the public interest supports the entry of the

injunction.  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002); *Clements v. Florida*, No. 2:16-

CV-100 FTM-29MRM, 2016 WL 3913136, at *1 (M.D. Fla. July 20, 2016).  The party seeking

the injunction must prove it has "clearly carrie[d] its burden of persuasion on each of these [four]

prerequisites."  *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322

(11th Cir. 2015).  The failure to prove any one of the four factors is fatal.  *Id.* at 1329.

### A.   Pirtek Cannot Prove that there is a Substantial Likelihood that it Will Prevail on the Merits of its Breach of Contract and Fraudulent Inducement Claims

To warrant a preliminary injunction, Pirtek must prove that there is *substantial* likelihood

that it will prevail on its breach of contract claims and fraudulent inducement claim.

*GeorgiaCarry.Org, Inc.*, 788 F.3d at 1329.  It cannot do so.

### 1.   Pirtek Is Not Likely to Prevail on Its Breach of Contract Claims because the Contract was Rescinded

Count I of the Complaint alleges a breach of contract based on the Franchise Agreement's

covenant not to compete and Count II of the Complaint alleges a breach of contract based on the

Franchise Agreement's confidentiality obligations.  Complaint at ¶¶46-62.  These causes of action

fail to even state a claim because there is no valid and enforceable contract.

"The effect of rescission is to render the contract abrogated and of no force and effect from the beginning." *Borck v. Holewinski*, 459 So. 2d 405, 405–06 (Fla. 4th DCA 1984).[3]  If there is no contract, then "there can be no [non-compete or confidentiality] clause 'of the contract.'" *Id.* Simply put, "where there has been a valid rescission of the contract, there is no longer any contract to enforce and, therefore, *no longer a cause of action for breach*." *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 262 n.6 (Nev. 1997) (emphasis added).[4]

On March 3, 2016, the Twillmans informed Pirtek that they wanted to "cancel the Franchise Agreement" because of union issues.  Complaint at ¶31; Dee Affidavit at ¶32.  They informed Pirtek that they could not proceed with the franchise, thanked Pirtek for working with them, and then requested the return of their $25,000 check, noting the "franchise agreement gives us the ability to discontinue this project at this time and receive back our $25,000.00 dollar down payment."  Dee Affidavit at ¶32.  The Twillmans then marked the contract as "Withdrawn / Cancelled" and returned all of Pirtek's materials to them.  Michael Affidavit at ¶¶8-12.

The Twillmans' actions followed the *exact* cancellation procedure outlined by Item 5 of the FDD:

> We will return to you your Initial Franchise Fee, Opening Set-up Fee and Pirtek Data System and Computer Connection Fee (without interest) *and cancel the Franchise Agreement* only under the following circumstances: (i) if you notify us in writing and withdraw your franchise application prior to the commencement of the training program;

Dee Affidavit at ¶34.  Michael, under whose name the Pirtek Franchise would be established, Complaint at ¶16, never received or attended any Pirtek training, Michael Affidavit at ¶13.  An

---

[3] Defendants are not applying Florida law based on any provision in the Franchise Agreement.  Instead, Defendants are applying Florida law because in diversity cases, the Court must apply "the substantive law of the forum state; here, Florida." *Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015).

[4] Termination of a contract, meanwhile, is legally distinct from rescission, "in that the former preserves the remedy of damages for breach, whereas the latter does not." *Generaux v. Dobyns*, 134 P.3d 983, 987 (Ore. 2006); *see also United States v. Hernandez-Arias*, 757 F.3d 874, 882 (9th Cir. 2014) ("The difference between rescission and termination is one of timing, similar to the difference between annulment and divorce.").

internal Pirtek "Start-up Calendar" confirms that the Twillmans cancelled the Franchise Agreement before Michael received any training.  *See* Pirtek Start-Up Calendar.[5]

Tellingly, Pirtek never disputed the cancellation.  Michael Affidavit at ¶11; *see also* Dee Affidavit at ¶33 (noting that Pirtek affirmatively responded "Understood!" following the notice of cancellation).  Pirtek explicitly acknowledged receiving a copy of the *cancelled* executed franchise agreement and stated that "A refund check has been issued and will be mailed out today."  Michael Affidavit at ¶10.  On March 17, 2016 – a matter of days after informing the company that they would have to cancel the Franchise Agreement – Dee received and deposited a refund check from Pirtek for $25,000.  Dee Affidavit at ¶39.

Cancelling the Franchise Agreement had the legal effect of rescinding the Franchise Agreement as a matter of law.  *See generally Hymowitz v. Drath*, 567 So. 2d 540, 542 (Fla. 4th DCA 1990) ("[C]ancellation of the purchase money note amounted to a rescission of the stock purchase agreement itself."); *see also* 17B C.J.S. Contracts § 585 ("Generally, to rescind a contract means to annul, abrogate, unmake, cancel, or avoid it.").  Indeed, a previous iteration of *Black's Law Dictionary* defined Rescission as "to avoid, or *cancel a contract*; particularly, nullifying a contract by the act of a party . . . ."  *Burson v. Capps*, 102 A.3d 353, 364 (Md. 2014) (quoting *Black's Law Dictionary* 1306-07 (6th ed. 1990)) (emphasis added).  By cancelling the Franchise Agreement, the Twillmans rescinded the contract between the parties as a matter of law based upon a mutually agreed-upon procedure for doing so.  *See generally Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) (noting that rescission may be effected by *mutual agreement of the parties*, by one of the parties without the other if a legally sufficient ground therefore exists, or by applying to courts for a decree of rescission).  And when a contract has been

---

[5] Defendants will be seeking leave to file this document under seal.

rescinded, there is no longer any contract to enforce and, therefore, "no longer a cause of action for breach."  *Great Am. Ins. Co.*, 934 P.2d at 262 n.6.  The breach of contract claims fail.

### 2.      Pirtek Is Not Likely to Prevail on Its Breach of Contract Claims because Pirtek Failed to Meet All Conditions Precedent

Under Florida law, the failure "to allege that conditions precedent are met renders a complaint fatally defective in that it fails to state a cause of action."  *Se. Land Developers, Inc. v. All Fla. Site & Utilities, Inc.*, 28 So. 3d 166, 168 (Fla. 1st DCA 2010), *disapproved of on other grounds by Bank of New York Mellon v. Condo. Ass'n of La Mer Estates, Inc.*, 175 So. 3d 282 (Fla. 2015); *see also Nguyen v. Roth Realty, Inc.*, 550 So. 2d 490, 491 (Fla. 5th DCA 1989) ("The failure to allege compliance with the condition precedent made the complaint in this case fatally defective.").

The Franchise Agreement between the Twillmans and Pirtek explicitly states that the Agreement will not become effective until the Principal Owner (Michael Twillman in this case), and others, successfully completes Pirtek's training program:

> B.      Training.
> Prior to commencement of your Business, you, your Principal Owner, your Designated Manager (if any), at least 2 MSS Technicians and your administration person must . . . attend and successfully complete our training program. . . .  *You understand that this Agreement will not become effective unless these individuals successfully complete the training program to our satisfaction.*

Franchise Agreement at §7(B) (emphasis added), attached to the Complaint as Exhibit A.  As noted above, Michael Twillman never successfully completed – let alone attended – the company's training program.  Pirtek is not likely to succeed on its breach of contract claims because it has not satisfied all conditions precedent of the contract.

**3.      Even Assuming a Valid and Enforceable Contract, Pirtek is Unlikely to Succeed on the Merits of Its Breach Claims**

Pirtek cannot show that there is a valid and enforceable contract between the parties.  But even assuming the Franchise Agreement is valid and enforceable, and was not rescinded, Pirtek is still unlikely to prevail on the merits of breach claims.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2nd DCA 2006) (noting that to prove breach of contract, a plaintiff must show the existence of a valid contract, a breach of that contract, and damages stemming from that breach).

Pirtek alleges that the Twillmans have breached the Franchise Agreement by soliciting Pirtek's customers, utilizing Pirtek's confidential information in running American Hydraulic, and by hiring away two employees from the Overland, Missouri Pirtek franchise.  *See* Complaint at ¶¶37-42; Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law ("Injunction Brief") at 13-19.

American Hydraulic has not solicited Pirtek's customers in violation of the Franchise Agreement.  In his Declaration, Tim Hastings states that American Hydraulic has solicited business from Subsurface Constructors, Inc., G.W. Van Keppel Co., Dave Kolb Grading, Inc., Drilling Services Co., and Cummings McGowan & West, Inc.  Declaration of Tim Hastings in Support of Pirtek USA's Motion for Preliminary Injunction at ¶5.  Randy McElroy states that American Hydraulic solicited his business at Missouri Smelting Technology, Inc.  Declaration of Randy McElroy in Support of Pirtek USA's Motion for Preliminary Injunction at ¶¶2-6.

These arguments and statements ignore Dee's forty-plus years of experience in the construction industry.  Dee Affidavit at ¶6.  Over the course of forty-years she has come to know and work for, or work with, many of the contractors in town, including Subsurface Constructors, Inc., G.W. Van Keppel Co., Dave Kolb Grading, Inc., Drilling Services Co., Cummings McGowan & West, Inc., and MOST, Inc.  *Id.* at ¶¶6-7 (noting that she personally knew the founder of Dave

12

Kolb Grading, Inc.).  These arguments and statements also ignore the fact that all but one of these businesses (MOST, Inc.) received Local 513's letter urging them not to do business with Pirtek because Pirtek did not have a union contract.  *Id.* at ¶¶27-28.  Dee Twillman is not breaching any Franchise Agreement, or engaging in any "poaching" by calling on customers, clients, and contacts that she has developed during her four decades in the construction industry.  *See generally GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335 (M.D. Fla. 2010) ("[A]n employer cannot preclude a former employee from using contacts and expertise gained [elsewhere].").

The Twillmans are not using any of Pirtek's confidential information.  Dee Affidavit at ¶¶41-47; Michael Affidavit at ¶14; Affidavit of Donald J. Twillman in Support of Defendants' Motion to Transfer and in Support of Defendant's Opposition to Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law ("Donald Affidavit") at ¶6. Instead, the Twillmans are running American Hydraulic on the strength of their twenty years in the hose fitting business.  Dee Affidavit at ¶¶8, 42.  The Twillmans are not using information received from Pirtek's Start-Up Guide in running American Hydraulic.  *Id.* at ¶46.  Indeed, a review of this Guide demonstrates that it is little more than a promotional brochure, with only the most generalized financial projections.  *See* Pirtek Start-Up Guide.[6]

More fundamentally, there is no secret sauce.  The work that American Hydraulic performs involves repairs to heavy construction and any machinery that utilizes hoses and fittings which has sustained broken or damaged rubber hydraulic hoses and engine hoses.  The process does not involve any secret information and can be learned quickly by a mechanic.  Dee Affidavit at ¶53; *see also id.* at ¶52 (noting that two other union hose businesses also employ mobile vans). American Hydraulic calls its technicians MSSTs not because it is copying Pirtek, but because this

---

[6] Defendants will be seeking leave to file this document under seal.

is how Local 513 refers to its members who perform this line of work. *Id.* at ¶48. Two companies in the same general line of work may engage in best practices or standard practices without breaching a franchise agreement or running afoul of competition laws. *See Thyssenkrupp Elevator Corp. v. Hubbard*, No. 2:13-CV-202-FTM-29, 2013 WL 5929132, at *4 (M.D. Fla. Nov. 4, 2013) ("Information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection.").

Finally, Daniel Wiele and James Pfaffenback, the former Pirtek employees, may lawfully use their knowledge and experience in the industry, even when going on to work for a competitor. *See Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 620 S.E.2d 222, 231 (N.C. Ct. App. 2005) ("None of the converted employees had the right to use BPS/Sunbelt confidential business information, but they could use the experience and contacts they had gained from years in the AWP [aerial work platforms] business."). Wiele and Pfaffenback left the Pirtek Overland Franchise because they were unhappy there, were being treated unjustly, and were not receiving adequate training. American Hydraulic did not induce them to change employers or solicit their employment. Dee Affidavit at ¶48. A restrictive covenant (and Defendants maintain there is no valid covenant because the contract was rescinded) cannot be used as a "tool simply to eliminate competition and may be unreasonable if it inflicts an unduly harsh or unnecessary result upon the [former] employee." *Thyssenkrupp Elevator Corp.*, 2013 WL 5929132, at *6. Indeed, in *Thyssenkrupp Elevator,* the Court found it would be unreasonable to enjoin a former employee from making his living acting as a mechanic. *Id.; see also Edwards v. Harris*, 964 So.2d 196, 198 (Fla. 1st DCA 2007) (per curiam) (reversing the trial court's order that granted an injunction because the order "unnecessarily restricted competition by enjoining the appellant from working

with another competitor in any capacity."). Pirtek is not substantially likely to prevail on its breach of contract claim.

### 4.   Pirtek is Unlikely to Succeed on its Fraudulent Inducement Claims

To satisfy Rule 9(b), a plaintiff alleging fraud must describe: "the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiff[]; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007).   "In a case involving multiple defendants the complaint should inform *each defendant* of the nature of his alleged participation in the fraud." *Id.* at 1317 (emphasis added).   The allegations cannot simply "lump[] together" all of the defendants. *Advisor's Capital Investments, Inc. v. Cumberland Cas. & Sur. Co.*, No. 8:05-CV-404-T-23MAP, 2007 WL 220189, at *5 (M.D. Fla. Jan. 26, 2007).

As written, Count III fails to delineate the alleged misrepresentations attributable to each of the three defendants and fails to provide the specifics surrounding the time and place of the alleged misrepresentations. *See Ambrosia Coal & Const. Co.*, 482 F.3d at 1316-17.   Instead, the Complaint impermissibly lumps Michael and Dee together, alleging that "Dee and Michael Twillman made misrepresentations of material fact to Pirtek USA by representing that they intended to own and operate a Pirtek USA franchise," that "Dee and Michael Twillman knew of the falsity of their representations when made," and that "Dee and Michael intended for Pirtek USA to rely on their representations . . . ."   Complaint at ¶¶64-66.

Pirtek has engaged in an impermissible heaping of inference upon inference to suggest fraud. *See U.S. ex rel. Sanchez v. Abuabara*, No. 10-61673-CIV, 2012 WL 5193415, at *6 (S.D. Fla. Oct. 19, 2012).   Pirtek would have the court infer that because the franchise agreement did not

proceed, the Defendants must have never intended to proceed with it to fruition, the Defendants must have intended to proceed with the franchise process only to the point when they could obtain Pirtek's confidential information, and must have made representations of their intention to proceed in order to fool Pirtek to allow them to do this. *See id.* ("Rule 9(b) requires that a complaint do more than, as here, narrate a series of events from which the existence of fraudulent conduct is merely possible."). Obviously, there are equally if not more plausible explanations (namely the union issue) for what transpired that do not support any inference of fraud. In sum, Plaintiff's Complaint alleges "'fraud by hindsight.'" *Id.* (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)) (dismissing fraud count for failure to state a claim).

Finally, Count IIII makes no mention of any representations of Donald Twillman or any contact between him and Pirtek let alone any misrepresentations. Count III fails to include a single reference to this named Defendant. Pirtek has failed to plead its fraudulent inducement claim with sufficient specificity to state a claim.

Even on the merits, this claim is not likely to succeed. Pirtek alleges that Michael and Dee never intended to own and operate a Pirtek franchise and sought only to acquire Pirtek's confidential information. This is not true. The Twillmans believed that a Pirtek franchise would be a good fit for them, and made every effort to make a Pirtek franchise viable. Dee Affidavit at ¶13. The Twillmans' interest in the franchise was genuine and the Defendants spent precious time and money travelling to Florida to meet with Pirtek employees to this end. Dee Affidavit at ¶14; Michael Affidavit at ¶16 (noting that except for the February 19, 2016 franchise signing, Michael had not been away from Missouri in six years). Ultimately, Pirtek's dispute with Local 513 scuttled the franchise; not any wrongdoing by the Twillmans. *See* Dee Affidavit at ¶¶20-32. Pirtek is not likely to succeed on its fraudulent inducement claim.

\*     \*     \*

Pirtek argues that a "franchisor has an interest in being able to place a new franchisee at or near the same location where customer goodwill has been created."  Injunction Brief at 15 (quoting *Jiffy Lube Int'l v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993)).  This point about goodwill is telling, for it was Pirtek, by engaging in a fight with Local 513, which compelled the union to urge more than 300 local contractors to boycott Pirtek, thereby damaging the Pirtek name throughout Missouri and Illinois and forcing the Twillmans to abandon their genuine interest in owning and operating a Pirtek franchise.  Dee Affidavit at ¶¶20-29.  Pirtek is not likely to succeed on the merits of its claims.  This conclusion makes consideration of the other factors unnecessary.  *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1329.

### 5.   Any Factual Disputes Only Highlight Pirtek's Inability to Show it is Likely to Succeed on the Merits

The affidavits of Dee, Michael and Donald Twillman contradict a number of statements made in Pirtek's brief and supporting affidavits.  For instance, Pirtek argues that the Twillmans did not return all of the company's materials.  Injunction Brief at 10.  Michael has sworn that they have and his affidavit includes the tracking number of his shipment.  Michael Affidavit at ¶¶9, 12.  Pirtek argues that the Twillmans' interest in a Pirtek franchise was a "sham" and based on "fraudulent pretense."  Injunction Brief at 11, 14.  Dee has sworn that her family's interest was genuine and that they made every effort to make the Pirtek franchise viable.  Dee Affidavit at ¶¶13-14.  Pirtek argues that the Twillmans are using their confidential information to run American Hydraulic.  Complaint at ¶¶57-58.  The Twillmans deny that they are using any of Pirtek's confidential information to run American Hydraulic.  Dee Affidavit at ¶¶41-47; Michael Affidavit at ¶14; Donald Affidavit at ¶6.

The very fact that there are conflicts or disputes over important facts in this case only highlights Pirtek's inability to prove a clear legal right to the relief requested. *Gen. Parts Distribution LLC v. Enright*, No. 8:13-CV-2500-T-23EAJ, 2014 WL 172116, at *6 (M.D. Fla. Jan. 10, 2014) ("These kind of factual conflicts . . . preclude a finding that Plaintiff is likely to succeed on the merits of [its] breach of Covenant Not to Compete claim."); *Anich Indus., Inc. v. Raney*, 751 So. 2d 767, 770-71 (Fla. 5th DCA 2000) (affirming the denial of injunctive relief and noting that the employee denied being aware of the former employer's costs, profits, and pricing structure, and the purchasing history and needs of the former employer's customers).

### B.    Pirtek Cannot Show that It will Suffer Irreparable Injury

A district court may grant injunctive relief only if the moving party shows that it will suffer irreparable injury unless the injunction issues. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam). The "asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* In this case, Pirtek cannot claim any non-speculative injury.

When a franchise claims that it has lost clients, but the evidence shows that the loss "may have nothing to with any actions taken by [the defendant]," any claim of irreparable harm is "remote and speculative at best." *GPS Industries*, 691 F. Supp. 2d at 1338. In this case, Pirtek has not proven that it has lost any clients as a result of the Defendants' actions. The Twillmans have not violated any of the restrictive covenants of the Franchise Agreement (assuming, of course, that the Agreement is even valid and enforceable). Instead, any clients that Pirtek lost are far more likely to have been the result of Local 513's letter campaign than any unlawful actions by the Defendants. Dee Affidavit at ¶¶27-29.

Pirtek argues that Florida's restrictive covenant statute presumes that the violation of an enforceable restrictive covenant creates an irreparable injury to moving party. Injunction Brief at

19 (citing Fla. Stat. §542.335(1)(j)).  If this is true then the corollary should also be true:  if the moving party has not demonstrated the violation of a valid and enforceable restrictive covenant – and Pirtek cannot given the contract's rescission – then the Court should presume that there has been no irreparable injury.  *See id.*  Finally, all of the Defendants have sworn that they are not using and are not in possession of any of Pirtek's confidential information.  Dee Affidavit at ¶¶41-47; Michael Affidavit at ¶14; Donald Affidavit at ¶6.  Pirtek cannot prove that it will suffer irreparable injury absent injunctive relief.  *See Curves Int'l, Inc. v. Mosbarger*, 525 F. Supp. 2d 1310, 1314-15 (M.D. Ala. 2007) (finding franchisor had not demonstrated that it would suffer irreparable harm absent injunctive relief, even though franchisor alleged franchisee had breached the non-compete agreement).

### C.    The Balance of Harms Favors the Twillmans

To be entitled to relief, Pirtek must establish that its injury outweighs the injury to the Twillmans.  *Siegel*, 234 F.3d at 1179.  It cannot do so.  Pirtek is an international franchise organization founded in 1997, with its United States headquarters in Rockledge, Florida. Complaint at ¶9.  The company provides hydraulic and industrial hose services to customers in the United States through its 58 franchises in 23 states.  *Id.*  Meanwhile, the Twillmans operate a series of small, family businesses.  Dee Affidavit at ¶4.  Granting the temporary injunction and enjoining the Twillmans from operating American Hydraulic would have a far greater financial impact on their businesses and livelihood than any countervailing impact on Pirtek from denying the injunction. The balance of harms favors the Twillmans.[7]

---

[7] In its brief, Pirtek speaks of a self-inflicted harm.  Injunction Brief at 20.  But it is Pirtek that delivered the self-inflicted harm, not the Twillmans, for it was Pirtek franchisees that decided to fight Local 513, leading the union to blanket the area's contractors with letters urging a boycott of Pirtek.  Dee Affidavit at ¶¶20-29.

### D.     A Preliminary Injunction Would Not Serve the Public

Pirtek must show that if issued, the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176.  It cannot do so.  The public interest supports healthy competition and the economic benefits that competition brings to the public and the marketplace as a whole.  *See Sixty Enterprises, Inc. v. Roman & Ciro, Inc.*, 601 So. 2d 234, 236 (Fla. 3rd DCA 1992).

In this case, American Hydraulic is filling a critical need in the St. Louis area.  Dee Affidavit at ¶51.  There are currently only two other union hose businesses in the greater St. Louis area and each of these businesses is a small business.  *Id.*  The public would thereby benefit from the additional services now available with another union hose business in the marketplace and would also generally benefit from the increased competition.  *See BMW of N. Am. v. Au-tomotive Gold, Inc.*, No. 96-384-CIV-J-20, 1996 WL 1609124, at *7 (M.D. Fla. June 19, 1996) ("[T]he public interest would be served by the competition which results from the availability of Defendant's product.").  The public interest favors the Twillmans.

## IV.     IF THE MOTION FOR INJUNCTIVE RELIEF IS GRANTED, THE COURT SHOULD ORDER PIRTEK TO DEPOSIT A SIGNIFICANT BOND

Before it issues a preliminary injunction, the movant must ordinarily give security in an amount "that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  If any injunction is entered, American Hydraulic stands to lose significant business and goodwill for every day that it is unable to operate.  The Court should therefore demand that Pirtek post a bond of $100,000.

## V.     CONCLUSION

For all the reasons stated above, this Court should decline to grant the extraordinary and drastic remedy that Pirtek requests, and deny Plaintiff's Motion for Preliminary Injunction.

20

Respectfully submitted,

/s/ Glenn E. Davis
Glenn E. Davis, Esq.   - Pro Hac Vice
HeplerBroom, LLC
One Metropolitan Square
211 North Broadway, Suite 2700
Saint Louis, Missouri
glenn.davis@heplerbroom.com
T: (314) 480-4154
F: (314) 241-6116


GREENSPOON MARDER, P.A.
Capital Plaza I, Suite 500
201 East Pine Street
Orlando, Florida 32801
Telephone:      (407) 425-6559
Facsimile:      (407) 244-8114
Email:          Larry.Brown@gmlaw.com

USHER L. BROWN, ESQ.
Florida Bar No. 321461


## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2016, I electronically filed the foregoing

Defendants' Joint Motion to Dismiss For Failure to State a Claim and Incorporated Memorandum

of Law by using the CM/ECF system and I caused a true and correct copy to be served upon

counsels of record James Michael Talley, Esq., and Kyle A. Diamantas, Esq., of Baker, Donelson,

Bearman, Caldwell & Berkowitz, PC, 200 South Orange Avenue, Suite 2900, Orlando, Florida

32801 via the Court's ECF system and by U.S. Mail.


By:  /s/ Glenn E. Davis
         Glenn E. Davis – Pro Hac Vice