# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PIRTEK USA, LLC,

        Plaintiff,

v.                                                                Case No. 6:16-cv-01302-Orl-37TBS

MICHAEL J. TWILLMAN, DOLORES M.
TWILLMAN, and DONALD J.
TWILLMAN,

        Defendants.
_____

## ORDER

This cause is before the Court on the following:

1.    Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law (Doc. 2), filed July 20, 2016; and

2.    Defendants' Joint Response in Opposition to Pirtek USA's Motion for Preliminary Injunction (Doc. 30), filed August 12, 2016.

Upon consideration, the Court finds that the Motion for Preliminary Injunction is due to be granted in part and denied in part.

Plaintiff Pirtek USA, LLC ("**Pirtek**") filed this action on July 20, 2016, alleging that Defendants Michael J. Twillman, Dolores M. Twillman, and Donald J. Twillman (collectively, "**the Twillmans**") breached certain confidentiality obligations and covenants not to compete and fraudulently induced the disclosure of confidential and proprietary information, which the Twillmans then used to create and operate a competing business. (Doc. 1.) Pirtek attached to its Complaint the documents which purportedly imposed the obligations and covenants at issue, namely: (1) a February 2016 franchise agreement

between Pirtek and Michael Twillman (Doc. 40-1, pp. 3–46 ("**Franchise Agreement**"));

and (2) a February 2016 personal guaranty (Doc. 40-2 ("**Guaranty**").)

Contemporaneously with its Complaint, Pirtek also filed the instant motion for preliminary

injunction through which it seeks to enjoin the Twillmans' continued use of the confidential

information and their operation of a competing business known as American Hydraulic

Services, LLC ("**American Hydraulic**").

On August 12, 2016, the Twillmans jointly filed their response to Pirtek's motion

for preliminary injunction (Doc. 30), together with motions to dismiss and transfer this

case to another district. (*See* Docs. 28, 29.)[1] The Court heard oral argument on Pirtek's

motion for preliminary injunction on September 8, 2016 ("**Hearing**"), and took the matter

under advisement.

## BACKGROUND[2]

Pirtek is a franchise company headquartered in Florida which sells, assembles,

and services hydraulic and industrial hoses and related equipment to customers in a

variety of industries including mining, construction, and agriculture. (Doc. 40, p. 3.)

Franchisees typically operate from "a hose service center" and through "mobile sales and

service units" to deliver and service equipment. *Id.*

Donald and Dolores "Dee" Twillman and their son Michael Twillman are citizens of

the state of Missouri who run a heavy equipment rental business known as Missouri

---

[1] Because Pirtek filed a Verified Amended Complaint on August 29, 2016 (Doc. 40, ("**Complaint**")), Defendants' previously-filed Motion to Dismiss was rendered moot. (*See* Doc. 47.)

[2] The facts stated in this section are drawn from the Complaint, numerous affidavits of record, and associated exhibits—the authenticity of which is not in dispute. (*See* Docs. 3–8, 31, 32.)

Crane, Inc. ("**Missouri Crane**"). (Doc. 31; *see also* Doc. 30, pp. 1–2.) According to the Twillmans, Missouri Crane also manufactures hoses and fittings. (Doc. 31.) In early 2016, the Twillmans expressed to Pirtek their interest in opening a franchise in Wentzville, Missouri, but stated that they did not want to staff the proposed franchise with unionized employees like those working at Missouri Crane. (Doc. 31; *see also* Doc. 30, p. 1.) During follow-up communications, the Twillmans shared with Pirtek their intention to start up the franchise by hiring two Mobile Systems and Service Technicians ("**MSSTs**") from a Pirtek franchise in Overland, Missouri ("**Overland Franchise**").[3] (Doc. 40, p. 5.)

On February 19, 2016, the Twillmans traveled to and attended a Pirtek "Discovery Day" at its Florida headquarters.[4] (*Id.* at 6.) At that time: (1) Michael Twillman executed the Franchise Agreement; (2) Michael and Dee Twillman signed the Guaranty; and (3) Dee Twillman wrote a $25,000 check to Pirtek covering half of the $50,000 fee required of new franchisees. (*Id.* at 6–7.) Donald Twillman signed the Guaranty shortly thereafter. (*Id.* at 6; *see also* Docs. 30, 40-2.)

Section 6.E. of the Franchise Agreement prohibits disclosure of Pirtek's confidential and proprietary information, and states:

> You may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or entity any Confidential Information . . . . For purposes of this Agreement, "Confidential Information" means proprietary information contained in the Manual or otherwise communicated to you in writing, verbally, or through the internet or other

---

[3] At the Hearing, counsel for Pirtek asserted that the MSSTs—Daniel Wiele ("**Wiele**") and James Pfaffenback ("**Pfaffenback**")—piqued the Twillmans' interest in developing a business similar to Pirtek's.

[4] Pirtek describes Discovery Day as "a one-day event . . . for potential franchisees to . . . learn about a range of topics essential to successfully operating a Pirtek center, including without limitation franchise training and support, supply chain management, Pirtek products and services, service delivery logistics and financial controls." (Doc. 40, p. 6.)

online or computer communications, and any other knowledge or know-how concerning the methods of operation of our Business. Any and all Confidential Information, including, without limitation, processes, materials, methods, procedures, suggested pricing, specifications, techniques and other data, may not be used for any purpose other than conducting the Business in the Territory.

(Doc. 40-1, p. 13 ("**Non-Disclosure Obligation**").)

Section 12.C. of the Franchise Agreement sets forth non-compete provisions and

states as follows:

**You** (including . . . any Personal Guarantors as described in Section 16.F) **may not engage** as an . . . agent or in any other capacity **in any other business that sells products and services similar to the products and services sold by a PIRTEK business** within the Territory or 15 miles of the territory or any Promotional Zone or the territory or promotion zone of any other PIRTEK center for a period of 2 years after expiration or termination of this Agreement. In addition, for the same 2-year period, **you may not employ or seek to employ any person who is at that time employed by any other PIRTEK franchise or center or otherwise directly or indirectly induce such person to leave his or her employment**. You expressly agree that the 2-year period and 15-mile radius are the reasonable and necessary time and distance needed to protect us if the Agreement expires or it terminated for any reason.

(Doc. 40-1, p. 25 ("**Non-Compete Obligation**")) (emphasis added.)

The Guaranty incorporates and imposes the same obligations. Specifically, the

Guaranty states that the guarantor signatories "agree to be personally bound by each and

every condition and term contained in the Franchise Agreement . . . including without

limitation the dispute resolution and noncompete provisions." (Doc. 40-2, p. 1.)

After their execution of the Franchise Agreement and Guaranty on

February 19, 2016, the Twillmans formed Missouri Hydraulics & Services LLC ("**Missouri**

**Hydraulics**"), through which they planned to operate the would-be franchise. (Doc. 31,

p. 3.) The Twillmans also received certain information which Pirtek considers proprietary

and confidential. (Doc. 40, pp. 8–10.) For instance, on March 2, 2016, Pirtek provided to

the Twillmans a "Start-Up Guide" that included or otherwise revealed: (1) detailed Pirtek center inventories and related costs; (2) detailed cost estimates, budgets and cash requirements applicable to the operation of a franchise using "a low-roof van option"; (3) three years of profit and loss projections; (4) a projected year-end balance sheet and cash flow analysis; (5) Pirtek mobile service equipment, options, and tool inventories; and (6) compensation and bonus schedules for Pirtek MSSTs.[5] (Doc. 6, pp. 5–6; Doc. 40, pp. 9–10.)

In correspondence to Pirtek dated March 3, 2016, the Twillmans purported to cancel the Franchise Agreement and requested that Pirtek return the $25,000 they paid in partial satisfaction of a $50,000 franchise fee. (Doc. 31-3.) Pirtek returned the money. (*Id.*)

On March 14, 2016, the Twillmans simultaneously dissolved Missouri Hydraulics and filed articles of incorporation for American Hydraulic. (Doc. 40-3; Doc. 40-4.) Pirtek asserts that American Hydraulic: (1) provides "the same mobile hydraulic services as Pirtek" in the area of St. Charles County, Missouri; (2) sells, assembles and installs industrial and hydraulic hoses; (3) employs two MSSTs—Wiele and Pfaffenback—who previously worked for the Overland Franchise; and (4) continues to compete with the Overland Franchise. (Doc. 40, p. 13.) Pirtek maintains that the establishment and operation of American Hydraulic present a violation of the Non-Disclosure and Non-Compete Obligations and underscores the Twillmans' plan to hoodwink Pirtek and use its proprietary information and methods to their advantage. (*Id.*) Pirtek seeks to enjoin

---

[5] Certain portions of this material were filed under seal pursuant to a Court Order. (Doc. 39.)

such conduct and cease the unauthorized business operations. (*Id.*)

The Twillmans assert that they genuinely intended to open a Pirtek franchise but were stymied by the activities and influence of Local 513 Hoisting and Portable of the International Union of Operating Engineers, AFL-CIO ("**the Union**"). (Doc. 31.) They state that the Union's interference and pressures weighed heavily against the establishment of a Pirtek franchise and even began to threaten operations at Missouri Crane. (*Id.*) Not long after their execution of the Franchise Agreement, it "became apparent [to the Twillmans] that establishing a non-union shop would be impossible and . . . jeopardize . . . their livelihood." [6] (Doc. 30, p. 2.)

The Twillmans therefore "decided to cancel the Franchise Agreement according to the terms of the Franchise Disclosure Document." (*Id.*; *see also* Doc. 31.) They maintain that their use of the "cancellation procedure" set forth in the Franchise Disclosure Document (Doc. 31-4 ("**FDD**")) had the effect of rescinding the Franchise Agreement, including its Non-Disclosure and Non-Compete Obligations. (Doc. 31, p. 7.)

Although their would-be Pirtek franchise did not "work out" as they purportedly planned, the Twillmans went forward with American Hydraulic under a contract with the Union with the goal of "expanding their existing hose business into a new business." (Doc. 30, p. 3.) They state that American Hydraulic neither evolved from nor relies upon "any protectable Pirtek confidential information." (Doc. 31, pp. 8–10.) Rather, American Hydraulic's operations are solely dependent on the Twillmans' industry contacts and past experience in the hose business. (*Id.*)

---

[6] The Twillmans assert that their concerns "were realized" in May 2016, when the Union sent letters to hundreds of area contractors urging them not to do business with Pirtek because it did not have a contract with the Union. (Doc. 30, p. 6; Doc. 31-2.)

**STANDARDS**

To prevail on a motion for preliminary injunctive relief in federal court, the movant must show that: (1) it has a substantial likelihood of success on the merits of its claims; (2) irreparable injury will be suffered unless the injunction issues; (3) the gravity of the threatened injury to the movant outweighs whatever harm the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). "The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the merits instead of a likelihood of success." *Siegel v. Lepore*, 234 F.3d 1163, 1213 (11th Cir. 2000).

As the first prong implies, preliminary injunctive relief must be predicated upon a cognizable cause of action which is adequately pled to withstand scrutiny under Federal Rule of Civil Procedure 12(b)(6). *See Paisey v. Vitale*, 807 F.2d 889, 892 (11th Cir. 1986) (affirming district court's denial of a motion for preliminary injunction and dismissal of count for injunctive relief for failure to state a claim). Because a preliminary injunction is "an extraordinary and drastic remedy," the movant must clearly satisfy the "burden of persuasion" as to each of the four prongs. *Siegel*, 234 F.3d at 1176; *see also NE Fla. Chapter of Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Further, the scope of injunctive relief must be "tailored to fit the nature and extent" of the objectionable conduct at issue. *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984).

**DISCUSSION**

The Court finds that Pirtek has carried its burden of persuasion in support of a preliminary injunction to enforce the Non-Disclosure and Non-Compete Obligations. However, the Court narrows the scope of the remedy proposed by Pirtek to prevent only conduct which clearly violates the restrictive covenants.

**A.     Substantial Likelihood of Success on Breach of Contract Claims**

Counts I and II of the Complaint assert breach of contract claims against the Twillmans based on their alleged violation of the restrictive covenants in the Franchise Agreement. (Doc. 40, pp. 14–17.) Count III asserts that the Twillmans fraudulently induced Pirtek to detrimentally disclose its own confidential and proprietary information. (*Id.* at 18.) The analysis herein is cabined to the breach of contract claims because they form the basis of Pirtek's request for preliminary injunctive relief.

Pirtek has demonstrated a likelihood of success on its breach of contract claims. Florida law indisputably applies to those claims. (*See* Doc. 40-1, pp. 34–35; Doc. 30, p. 9.) To prevail on a breach of contract claim under Florida law, a plaintiff must establish: (1) the existence of a contract; (2) a material breach; and (3) damages resulting from the breach. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

Pirtek has presented the Franchise Agreement and Guaranty—each of which is signed by the Twillmans and imposes upon them the restrictive covenants at issue. Pirtek has also alleged and made a preliminary showing that the Twillmans established and continue to operate a competing industrial hose business—American Hydraulic—which employs MSSTs formerly employed by the Overland Franchise and provides the same goods and services supplied by Pirtek in and around the territory contemplated by the

Franchise Agreement.

At the Hearing, Pirtek emphasized that the MSSTs currently serve and solicit the very same customers they previously served while working for the Overland Franchise. The MSSTs' familiarity with Pirtek's customer base and previous training directly inure to American Hydraulic's favor and effectively siphon business away from Pirtek. Although the amount of monetary loss is unclear, Pirtek has alleged and fairly demonstrated damages attributable to the resultant erosion of its customer base as well as the Twillmans' unauthorized use of its proprietary information and methods.[7]

In sum, Pirtek has set forth a compelling case in support of its breach of contract claims at this juncture of the proceedings. Although the Twillmans seek to avoid the claims and associated injunctive relief by arguing that the Franchise Agreement is or should be rescinded, their arguments are rejected for the reasons discussed below.

### 1.    FDD Cancellation Procedure did not Rescind Obligations

The Twillmans state that they followed "the exact cancellation procedure" set forth in the FDD and doing so "had the legal effect of rescinding the Franchise Agreement as a matter of law." (Doc. 30, pp. 9–10; *see also* Doc. 31, p. 7.) They distill the so-called procedure from the following provision of the FDD entitled "Item 5 Initial Fees":

> We will return to you your Initial Franchise Fee . . . and cancel the Franchise Agreement only under the following circumstances: (i) you notify us in writing and withdraw your franchise application prior to the commencement of a training program; or (ii) if you fail to successfully complete the training program to our satisfaction."

(Doc. 31-4, p. 4.) The Court is unpersuaded.

---

[7] At the Hearing, counsel for the Twillmans noted that American Hydraulic's average quarterly revenue is approximately $25,000.

The FDD was delivered to the Twillmans on February 2, 2016—more than two weeks before they executed the Franchise Agreement. (Doc. 6-1, pp. 4–5.) By its very terms, the FDD was an introductory document expressly intended to help the Twillmans "make up [their] mind" *before* entering into the Franchise Agreement and it too came with a "form confidentiality agreement." (Doc. 31-4, pp. 2–3.) There is no evidence that the FDD was integrated into the Franchise Agreement. To the contrary, the FDD states that a franchise agreement "will govern the franchise relationship" and cautions prospective franchisees against reliance on the FDD. (*Id.*)

The FDD provision cited by the Twillmans does not define or reference a "cancellation procedure." Rather, it plainly explains the circumstances under which a franchise *applicant* will be entitled to a refund of initial franchise fees and other preliminary fees paid to Pirtek. Nevertheless, even if the provision is construed as a cancellation procedure, compliance with the same would at most result in *cancellation* of the Franchise Agreement—not rescission. Any doubt on that issue is removed from the Franchise Agreement itself, which expressly prohibits rescission "except in writing by [both parties]" (Doc. 40-1, p. 33). There is no such written agreement of the parties here.

Accordingly, the Twillmans have not shown that satisfaction of the purported FDD cancellation procedure did rescind or could have rescinded the Franchise Agreement, much less vitiate its Non-Disclosure and Non-Compete Obligations. Furthermore, they have not set forth any "non-procedural" grounds for rescission, as discussed below.

### 2.    No Grounds for Rescission as a Matter of Law

Under Florida law, contract rescission is considered an extraordinary equitable remedy. *See Maryland Cas. Co. v. Krasnek*, 174 So. 2d 541 (Fla. 1965). While the

Twillmans accurately observe that the *effect* of rescission may "render the contract abrogated and of no force and effect from the beginning," *Borck v. Holewinski*, 459 So. 2d 405, 405–06 (Fla. 4th DCA 1984) (emphasis added), they do not point to a justifiable *cause* for rendering the Franchise Agreement rescinded and thus *void ab initio*.

Grounds for rescission of contract include misrepresentation, fraud, and duress. *See Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 2 (Fla. 3d DCA 2006) (permitting rescission of an insurance policy due to a misrepresentation in the application of insurance). The unilateral mistake of a contracting party may also support rescission, but only where the mistake: (1) concerns an essential element of the contract; (2) does not constitute an "inexcusable lack of due care" by the party seeking rescission; and (3) does not procure the other party's detrimental reliance such that it would be inequitable to order rescission. *Florida Ins. Guar. Ass'n, Inc. v. Love*, 732 So. 2d 456, 457 (Fla. 2d DCA 1999). In addition, rescission may be accomplished by mutual agreement of the contracting parties. *See Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) (noting that rescission may be achieved by agreement or by judicial decree)).

The Twillmans do not point to any fraud, duress, or mistake which frustrated the formation of the Franchise Agreement or support its post-formation rescission. Rather, they merely assert that "absent some ability to operate [their Pirtek franchise] as a non-union business, the Pirtek opportunity would provide no benefit to [them]." (Doc. 30, p. 4; *see also* Doc. 31.) They also state that "setting up a non-union [Pirtek franchise] . . . would have created significant problems . . . since Missouri Crane is a union company." (Doc. 30, p. 5.) Assuming these hardships would have arisen, they do not provide grounds to render the Franchise Agreement *void ab initio* such that each and every

provision therein suddenly disappears. To hold otherwise would offend Florida precedent which long ago dispensed with mere hardship as a basis for rescission. *See Intrn'tl. Realty Associates v. McAdoo*, 99 So. 117, 120 (Fla. 1924).

### 3.    Cancellation is not Tantamount to Rescission

Even setting aside the Franchise Agreement's express prohibition against rescission absent written agreement and assuming that it was effectively cancelled per the FDD's so-called procedure, the cancellation of a contract does not automatically procure its rescission. The Twillmans' argument to the contrary is untenable.

The Twillmans rely upon *Hymowitz v. Drath*, 567 So. 2d 540 (Fla. 4th DCA 1990) to support their view that cancellation of the Franchise Agreement amounted to its rescission. (Doc. 30, p. 10). The Court finds such reliance misplaced because *Hymowitz* did not concern the enforcement of restrictive covenants and did not treat cancellation and rescission as one in the same.

The court in *Hymowitz* set aside an arbitration award cancelling a promissory note. *Id.* at 542. Finding that the arbitrators purported to cancel the promissory note due to fraud, the court held that their cancellation was a nullity because the same fraudulent conduct effected the rescission of an underlying shareholder agreement from which the arbitrators derived their authority in the first place. *Id.* Setting aside the cancellation, the court announced that "where the parties arbitrate, the arbitrators exceed their powers if their award rescinds the very obligation which is the foundation of the contract from which they derive their authority." *Id.*

*Hymowitz* offers no guidance in this case and it does not support the contention that cancellation and rescission are synonymous. Indeed, such an interpretation of

*Hymowitz* would put it at odds with well-settled Florida law holding that cancellation and rescission are distinct concepts. *See, e.g., United Auto. Ins. Co. v. Salgado*, 22 So. 3d 594 (Fla. 3d DCA 2009) (holding that an insurer was entitled to rescission despite its noncompliance with the cancellation procedure)). On closer inspection of the decision, the court in *Hymowitz* did not equate or even correlate cancellation and rescission. Instead, it held that the arbitrators' purported cancellation of one agreement—*i.e.*, a promissory note—was a nullity because fraud caused the rescission of another—*i.e.*, a shareholder agreement—such that the arbitrators lacked authority to render *any* arbitration award. *Hymowitz*, 567 So. 2d at 542.

In any event, even if cancellation of a contract automatically causes its rescission, the rescission itself does not always abrogate every contractual obligation "as a matter of law" as the Twillmans suggest. In *Katz v. Van Der Noord*, 546 So. 2d 1047 (Fla. 1989), the Florida Supreme Court carefully distinguished contracts that never come into existence from contracts that exist but are later found to be unenforceable—there, to determine whether an attorney's fees provision in a rescinded contract was enforceable.

Answering the question in the affirmative, the court in *Katz* held that "when parties enter into a contract and litigation later ensues over that contract, attorney's fees may be recovered under [a fees provision] . . . even though the contract is rescinded or held to be unenforceable." *Id.* at 1049. The court explained that "the legal fictions" which accompany the rescission of a contract do not change the fact that a contract existed. *Id.* Noting that certain provisions of a void or voidable contract may remain operative solely on the basis of equitable considerations, the court concluded that "it would be unjust" to

preclude the recovery of fees in *Katz*.[8] *Id.*

Likewise, even if the purported cancellation of the Franchise Agreement amounted to its rescission, it would also be unjust to preclude Pirtek's enforcement of the Non-Disclosure and Non-Compete Obligations. As discussed in greater detail below, Pirtek has persuasively established the significant value it reasonably attaches to these restrictive covenants (the likes of which are replicated in *all* Pirtek franchise agreements) and the Court is not convinced that Pirtek's right to enforce the covenants in this case is somehow outstripped by the Twillmans' interests.

In light of the foregoing, the Court finds Pirtek has shown a substantial likelihood of success on its breach of contract claims under Counts I and II of the Complaint.[9] Although discovery and a more developed record may eventually prove otherwise, Pirtek has carried its burden of persuasion at this juncture such that the Twillmans have *likely* violated the Non-Disclosure and Non-Compete Obligations.[10]

---

[8] The vitality of *Katz* endures in Florida. *See, e.g.*, *Fabing v. Eaton*, 941 So. 2d 415, 418 (Fla. 2d DCA 2006) (holding that contractual fees may be permitted "when an existing contract is rescinded or rendered unenforceable by some subsequent act"); *see also Leo v. MacLeod*, 752 So. 2d 627, 628–29 (Fla. 2d DCA 1999) (holding that the party seeking rescission based on mutual mistake is not entitled to contractual fees in the absence of an opposing party's breach of the rescinded contract).

[9] The Court acknowledges that the ultimate merits of Pirtek's breach of contract claims may be decided in arbitration pursuant to the Franchise Agreement's arbitration clause. However, that does not disturb the Court's findings as to the merits of those claims at this time. While it is within the Court's purview to decide which claims *must be* committed to arbitration, there is no need to do so now. *See Musnick v. King Motor Co. of Ft. Lauderdale*, 325 F.3d 1255, 1261 (11th Cir. 2003); *see also Talk Fusion v. Ulrich*, 8:11-cv-1134-T-33AEP, 2011 WL 2681677 (M.D. Fla. 2011) (holding that the district court may grant injunctive relief pending arbitration).

[10] The Court rejects the remainder of the Twillmans' "merits" arguments, as they urge denial of Pirtek's motion on the basis of purported questions of fact. Such arguments overlook the appropriate standards applied to a request for preliminary injunctive relief.

**B.      Irreparable Harm**

Florida law firmly establishes the right to enforce covenants not to compete. *See Capelouto v. Orkin Exterminating Co.*, 183 So. 2d 532 (Fla. 1966); *see also Graphic Bus. Sys., Inc. v. Rogge*, 418 So. 2d 1084, 1086 (Fla. 2d DCA 1982); *Silvers v. Dis-Com Sec., Inc.*, 403 So. 2d 1133 (Fla. 4th DCA 1981). Indeed, the right to enforce reasonably tailored non-compete agreements is codified at § 542.335 of the Florida Statutes. Under the statute, the party seeking enforcement must show that the restriction protects a legitimate business interest which could include: (1) trade secrets;[11] (2) confidential business or professional information that does not otherwise qualify as a trade secret; (3) substantial relationships with specific existing or prospective customers; (4) goodwill within a specific geographic location; and (5) extraordinary or specialized training. *See* Fla. Stat. § 542.335(1)(b).[12]

Irreparable harm is presumed under Florida law where, as here, the proponent of injunctive relief has adequately pled the violation of a non-compete agreement. *See, e.g., Graphic Bus.*, 418 So. 2d at 1086–87 (explaining that "the practical difficulties of proving irreparable harm would tend to diminish the efficacy of covenants not to compete, which bear the imprimatur of the legislature and the courts of Florida"). Nevertheless, the

---

[11] A "trade secret" consists of information that: (1) derives independent economic value from not being generally known to and not readily ascertainable by others who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy. *See* Fla. Stat. § 688.002(4).

[12] Under Florida law, a restrictive covenant lasting six months or less is presumed reasonable and a restrictive covenant lasting for more than two years is presumed unreasonable. *See* Fla. Stat. § 542.335(1)(d); *see also Tomasello, Inc. v. de Los Santos*, 394 So. 2d 1069, 1072 (Fla. 4th DCA 1981) (finding that an agreement not to compete for a period of two years following termination was reasonable).

presumption may be rebutted. *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009).

Florida courts consider an injunction the "normal remedy" for breach of a restrictive covenant. *See Miller Mech., Inc. v. Ruth*, 300 So. 2d 11 (Fla. 1974); *see also Silvers*, 403 So. 2d at 1133 ("Because . . . most or all of the harm may be done long before a final judgment is entered, we hold that where the proof supports the skeletal allegations . . . stating a cause of action [for breach of a restrictive covenant], then temporary or emergency injunctive relief may properly be granted."))

Here, Pirtek has legally enforceable rights to protect valuable confidential and proprietary information and it has shown substantial and ongoing measures it has taken to guard such information. Indeed, Pirtek required the Twillmans to agree in writing that they would protect *all* confidential and proprietary information they received from Pirtek while preparing to open their would-be franchise. Even the FDD attached a confidentiality agreement. While the Twillmans deny their alleged use of confidential and proprietary information, they do not dispute that they hired and continue to employ the MSSTs—the primary, if not singular, source through which the Twillmans actually put Pirtek's "know how" and proprietary information to use. Furthermore, the Twillmans openly admit that American Hydraulic *does* compete with Pirtek. (*See, e.g.*, Doc. 30, p. 2.)

Although the Court may presume irreparable harm under the circumstances, Pirtek has affirmatively and persuasively established a real and immediate threat to its legally enforceable rights.[13] Specifically, Pirtek has shown that if a preliminary injunction does

---

[13] In turn, Pirtek has demonstrated its standing. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1241 (11th Cir. 2003) (holding that an injury-in-fact must be examined and demonstrated when seeking preliminary injunctive relief).

not issue: (1) Pirtek will be forced to compete with the Twillmans—the would-be franchisees—and personnel who were formerly trained by Pirtek and employed by a nearby franchise; (2) Pirtek faces a substantial risk of losing exclusivity in the market served by American Hydraulic; and (3) the durability of Pirtek's non-compete and nondisclosure agreements with other franchisees may be subject to a greater threat of disruption or challenge.

While the Twillmans deny the existence or threat of such harm, they offer nothing to disprove it. Accordingly, the Court concludes that the irreparable harm prong is satisfied in this case even in the absence of the statutory presumption.

## C.     Gravity of Harm to Each Party

Under Florida law, courts do not consider any individualized economic or other hardship that might be caused to the party against whom enforcement of a valid restrictive covenant is sought. *See* Fla. Stat. § 542.335(1)(g). The Court therefore dismisses the contentions and affidavits offered by the Twillmans with respect to potential economic and other hardship that enforcement of the restrictive covenants will purportedly inflict upon them. Removing such matters from the Twillmans' side of the scale and considering Pirtek's showing of the past injury and prospective future harm noted above, the balance of harm weighs decidedly in Pirtek's favor.

## D.     Public Interest

"[T]here is a benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations." *R.J. Gators Franchise Sys., Inc. v. MBC Rests., Inc.*, No. 2:05-cv-00494-VMCDNF, 2005 WL 4655379, at *5 (M.D. Fla. 2005) (granting preliminary injunction to enjoin violations of non-compete

agreement). Indeed, § 542.335 of the Florida Statutes declares the state's public policy favoring the enforcement of such covenants. Under the statute, if a court refuses to enforce a valid restrictive covenant on the basis of public policy, it must specify how the policy is violated via enforcement. *See* Fla. Stat. § 542.335(1)(i). The court must also explain how and why public policy outstrips the protection of legitimate business interests sought by the party seeking enforcement. *Id.*

Here, preliminary injunctive relief would serve the public interest by promoting stability of business relations and reliability of contracts. It would also enhance free and open trade by preserving confidential and proprietary information and trade secrets which sometimes must be shared to develop and expand commercial interests.

The Twillmans do not effectively debunk these points, but instead argue that public interest suffers when an injunction is issued without substantial evidence and a final determination of the merits of a claim. These conclusory assertions jettison the appropriate analysis reserved to requests for preliminary injunctive relief and do not outweigh the vital public interests articulated above.

In light of the foregoing, the Court concludes that Pirtek has satisfied the "public interest" prong in support of its request for preliminary injunctive relief.

**E.     Bond**

Absent circumstances which do not exist here, Pirtek must provide security to compensate the Twillmans for costs and damages sustained by them if they are wrongfully enjoined. *See* Fed. R. Civ. P. 65(c); *see also* Fla. Stat. § 542.335(1)(j) (providing that "no temporary injunction shall be entered unless the person seeking enforcement of a restrictive covenant gives a proper bond"). Pirtek has the burden of

establishing the reasonableness of a proposed bond. *See Carillon Importers, Ltd. v. Frank Pesce Int'l Grp.*, 112 F.3d 1125, 1127 (11th Cir. 1997).

Pirtek requests that the Court waive the bond requirement set forth under Rule 65(c) or otherwise require a nominal bond because the only harm to Defendants is the cessation of an "unlawful" competing business. (Doc. 2, p. 21.) The Twillmans request a bond in the amount of $100,000 because "American Hydraulic stands to lose significant business and goodwill for every day that it is unable to operate." (Doc. 30, p. 20.) In view of the entire record and competing interests at hand, the Court concludes that $50,000 is sufficient to protect the Twillmans against loss associated with an erroneous injunction.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.    Pirtek USA's Motion for Preliminary Injunction and Incorporated Memorandum of Law (Doc. 2) is due to be **GRANTED IN PART AND DENIED IN PART** as follows:

   a.    The Motion is **GRANTED** to the extent that Defendants Michael Twillman, Dolores Twillman, and Donald Twillman and their agents, servants, employees, attorneys, and any other persons or entities who are in active concert or participation with them individually or collectively ("**the Twillmans**") are **hereby**:

      i.    **DIRECTED** to immediately destroy or return to Pirtek all Confidential Information as that term is defined in the Franchise Agreement;

      ii.    **ENJOINED AND PROHIBITED** from operating any business

which sells products and services substantially similar to those provided by Pirtek or a Pirtek franchise within St. Charles County, Missouri, and within a fifteen-mile radius of either St. Charles County or the Pirtek Overland Franchise until March 3, 2018 or dissolution of the injunction by the Court, whichever comes first;

iii. **ENJOINED AND PROHIBITED** from disclosing any Confidential Information as that term is defined in the Franchise Agreement and any other agreement(s) they have entered into with Pirtek. This includes, without limitation, information conveyed to the Twillmans by Pirtek regarding Pirtek's processes, materials, methods, procedures, suggested pricing, specifications, and techniques; and

iv. **ENJOINED AND PROHIBITED** from using any proprietary information, methods, or trade secrets maintained by Pirtek which were disclosed to the Twillmans by Pirtek or any other persons or entities. This includes, without limitation, the use or employment of current and former Pirtek employees, agents, MSSTs, and other persons familiar with Pirtek's customer lists, processes, materials, methods, procedures, suggested pricing, specifications, and techniques.

b. In all other respects, Pirtek's Motion for Preliminary Injunction is **DENIED**.

2.      This injunction shall not become effective until Pirtek: (a) posts a bond with this Court in the amount of **$50,000.00**; and (b) files with the Court and serves upon Defendants' counsel a Notice of Posting Bond.

3.      Within fifteen (15) days of the date upon which Pirtek satisfies the requirements of paragraph 2 immediately above, Defendants shall file with the Court and serve upon Plaintiff's counsel a Notice of Compliance setting forth the date(s), manner, and form in which Defendants have complied with the terms of this preliminary injunction.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on October 6, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record